FLORENCE M. WITMER and D. W. WITMER, Appellants, v. J. C. NICHOLS, D. M. PINKERTON, WILLIAM VOLKER, JAMES E. NUGENT, CAROLYN M. FULLER, W. A. ARMOUR, E. C. MESERVEY, J. C. NICHOLS INVESTMENT COMPANY, CHARLES W. ARMOUR, and SCHOOL DISTRICT OF KANSAS CITY.—8 S. W. (2d) 63.

Division One, July 3, 1928.

*Proctor & Phillips* for appellants.

*Meservey, Michaels, Blackmar, Newkirk & Eager* for respondents.

RAGLAND, J.—The appeal in this cause is from a judgment rendered on a general demurrer to the petition. The question for determination is whether the petition states a cause of action entitling the plaintiffs to the relief prayed for, or any equitable relief.

According to the petition the plaintiffs are resident taxpayers of the School District of Kansas City; the individual defendants, other than C. W. Armour, are the members of the School Board of said district; Armour, at the times of the transactions involved, was merely the owner of a large body of farm or grazing land in the southwest portion of Kansas City; and the J. C. Nichols Investment Company, a corporation in which defendant J. C. Nichols was a large stockholder and of which he was president, was at said times commercially engaged in developing vacant lands for residential purposes in Kansas City, and particularly in the southwest portion thereof. Respondent, C. W. Armour, has died pending the appeal,

but the cause has not been revived as against him in the name of his heirs.

The facts pleaded as constituting a cause of action may be summarized as follows:

On or about January 1, 1922, Nichols and the Investment Company purchased from Armour for residential development 230 acres of vacant land, located south of 65th Street and east of Wornall Road in the southwest portion of Kansas City, paying therefor an average price of $1625 per acre. Coincident with that transaction, or shortly thereafter, the members of the School Board sought to purchase from Armour a high school site at or near the southwest corner of 65th Street and Wornall Road, but Armour refused to sell any of his land for a school site. During the time the members of the school board were endeavoring to buy a school site from Armour, he entered into negotiations with Nichols and the Investment Company looking to a sale to them of a tract of seventy-four acres of vacant land, located south of 65th Street and west of Wornall Road and which included the fifteen acre high school site in controversy in this proceeding. Armour asked $4000 per acre for the seventy-four acre tract, but Nichols and the Investment Company offered him only $2500 per acre. Finally Armour offered to sell the entire tract at $3500 per acre, but Nichols and the Investment Company refused to purchase even at that price. At this juncture Armour on the one side and Nichols and the Investment Company on the other devised the following scheme or plan: "Armour was to dispose of his entire seventy-four acre tract at the price and sum of $3500 per acre, payable $75,000 cash and balance on terms; Nichols and the Investment Company were to obtain title to at least fifty-nine acres of said seventy-four acre tract at the price and sum of $3118 per acre with no cash payment down, but on three equal deferred payments maturing in five, seven and ten years respectively; and the title to fifteen acres of said seventy-four acre tract should pass to the School District of Kansas City for a consideration of $5000 per acre, payable all cash."

Pursuant to the scheme just referred to a written contract was prepared, purporting to be between Armour and one Josephine Kelly, "a straw person," and wherein and whereby Armour agreed to sell and Kelly agreed to buy the seventy-four acre tract on the following terms: Consideration $3500 per acre, purchaser to pay seller $10,000 in cash upon the signing of the instrument, $65,000 upon the consummation of the sale and the remainder in three equal installments, one at the end of five years, one at the end of seven years and one at the end of ten years thereafter respectively. Kelly signed the instrument on the 17th day of May, 1922, and on the same day indorsed thereon an assignment in blank of her purported in-

terest under the contract. On the 18th day of May, 1922, Nichols and the Investment Company "attached their signatures to said contract: by the indorsement thereon that they approved of the terms of said contract; that they would carry out its provisions in all details; that they would pay the $10,000 cash payment required in and under said contract and would execute, or cause to be executed, three equal notes for $61,667, due in five, seven and ten years respectively." At the same time "they . . . deposited their own check for $10,000 on account of the purchase price of said seventy-four acre tract." The contract was signed by Armour on the 21st day of May, 1922. On May 26, 1922, the School District by its president, defendant Pinkerton, entered into a purported contract with said Kelly for the purchase of fifteen acres at the southwest corner of the intersection of Wornall Road with 65th Street, being a part of the seventy-four acre tract. By the terms of such contract the School District was to pay $75,000 in cash upon the delivery to it of a warranty deed conveying the title. Subsequently, on May 29, 1922, Nichols, as a member of the School Board introduced at a meeting of the board a resolution providing for the purchase of the said fifteen acre tract for a high school site and authorizing the issuance of a voucher in the sum of $75,000 to be used in paying for it. The resolution was unanimously adopted, Nichols himself voting therefor. On June 16, 1922, Armour executed and delivered to the School District a warranty deed conveying to it the fifteen acre tract, and the district issued to him a voucher in the sum of $75,000, which was "drawn on and paid out of the funds . . . belonging to the taxpayers of the said School District," thereby and to that extent depleting such funds. At the same time that Armour made the conveyance to the School District he conveyed the remainder of the seventy-four acre tract, fifty-nine acres, to Kelly, and she in turn executed and delivered to him three notes, each for $61,667, and maturing five, seven and ten years after date, respectively, together with a deed of trust against the land to secure their payment. Kelly then conveyed the fifty-nine acres, subject to the deed of trust, to Nichols and the Investment Company. Immediately after the execution of the deeds just mentioned Armour redelivered to Nichols and the Investment Company the cash deposit theretofore made by them of $10,000. The three deeds, however, were not filed for record until April 12, 1923; the delay in recording them was for the purpose, it is alleged, of "withholding from the public any knowledge of the transaction hereinbefore mentioned."

All of the details of the "scheme" were known to every member of the School Board, except that the members other than Nichols, did not know that he and the Investment Company personally deposited

with Armour $10,000 in cash as a first payment on the purchase price of the seventy-four acre tract, that the $10,000 was subsequently returned to them and that they were given a period of ten years in which to finally pay for the fifty-nine acres.

Immediately after the purported sale of the school site to the School District, Nichols and the Investment Company put on an intensive selling campaign for the purpose of disposing of their 230 acre tract, and by reason of the location of the high school site the value of their land was not only greatly enhanced, but sales were greatly facilitated.

The members of the School Board have expended large sums of the taxpayers' money "in the form of sewers, paving and other kindred improvements." At the time they attempted to purchase the site they "did not have in contemplation the construction of a school building . . . within several years thereafter."

From the foregoing facts the legal conclusion is drawn that the purported sale and conveyance to the School District was illegal and void, for the reason that Nichols, a member of the School Board, directly and indirectly derived benefit and advantage from the transaction of which it was a part, in this: he and his Investment Company obtained, on long deferred payments and without the expenditure of any cash, fifty-nine acres of land at a much less price than the owner had previously asked for it, and further, that the 230 acres of land which he and his company owned was greatly enhanced in value and its sale greatly facilitated.

The prayer is: that the purported sale and conveyance be declared null and void; that the members of the School Board be required to convey the said fifteen acre tract to the rightful owners thereof; that Armour, Nichols and the Investment Company be required to account to the School District for all sums of money received from said transactions, with interest; and that the members of the School Board be required to reimburse the taxpayers of the School District for all sums of money expended in the purported purchase and maintenance of said tract.

On the face of the allegations the conclusion could well be drawn that Nichols, knowing that the School Board was desirous of securing a high school site on Armour's land near the southwest corner of 65th Street and Wornall Road and that it was unable to do so, bought the entire tract for himself, and then sold the district a site, thereby obtaining the personal benefits and advantages pointed out in the petition. Notwithstanding, the petition seems to have been drawn on the theory that Armour sold the district the school site, but that the sale and conveyance of the site was part and parcel of a scheme engineered by Nichols whereby the latter not only succeeded in boosting the value of the land he already owned but was

enabled to acquire another tract on more advantageous terms than he could otherwise have obtained. This view was adopted by the pleader, no doubt, in order to avoid the effect of the decision in Bedell v. Nichols, 316 Mo. 881, 292 S. W. 21, where the facts were in evidence, and where, on the facts, it was held that Nichols was not a party to the contract of sale. But on either theory of fact the transactions, in so far as the School District was involved, contravened public policy. Nichols as a member of the Board of Directors owed the School District an undivided loyalty in the transaction of its business and in the protection of its interest; this duty he could not properly discharge in a matter in which his own personal interests were involved. The principle is so well settled that we do not deem it necessary to cite authorities.

It is appellants' position that on account of the illegality just referred to the alleged contract of sale and conveyance was absolutely void. For the purposes of the case it will be so assumed.

It is to be first noted that the question of enforcing the contract or in any way giving it effect is not involved. The contract has been completely executed on both sides. What the plaintiffs seek is a recovery for the School District of the moneys paid out for the site. In so doing they recognize that under equitable principles the district is bound to restore to the rightful owners the possession of the land which it obtained in consideration for the money. [Sparks v. Jasper County, 213 Mo. 218, 112 S. W. 265.] The general rule is that where the parties to an illegal contract are *in pari delicto*, and the contract has been fully executed on both sides, neither will be aided in recovering what has been paid out under the contract. The rule is without application, however, in cases in which the public interest will be better promoted by granting than by denying relief. [Winchester Electric Light Co. v. Veal, 145 Ind. 506; 6 R. C. L. 829, sec. 220.] Whether this is such a case we will next consider.

The petition does not directly, or inferentially, charge fraud or collusion on the part of any of the persons who participated in the transactions which culminated in the conveyance to the School District. It is not alleged that the price paid was excessive or that the district did not get full value for its $75,000. It is asserted that the School Board at the time of the purchase did not intend to erect a building for several years; yet it appears that, before the genesis of the "scheme," it was seeking to acquire, if not the identical site in controversy, one in its immediate vicinity. Because they had the foresight to anticipate the district's needs and acquire a site in that locality before real estate values had risen through the development and growth of that part of Kansas City, their expenditure therefor cannot be regarded as wasteful or improvident. Then if the district

needed the site and·it acquired it at a fair and reasonable price, as must be assumed, what possible good will be subserved by undoing what its board did? Of course Nichols could resign from the board and it could then, without a suspicion of the taint of illegality, repurchase the site from Armour's heirs. But it was said in oral argument that the site is now occupied by a handsome high school building, and real estate values in its vicinity have no doubt greatly risen—how could equity deal with a situation like that, no fraud being charged? The School Board might find itself greatly embarrassed in its efforts to reacquire its site and building at any thing like its original expenditure therefor. The decree prayed for would vindicate an abstract principle of equity, but probably at the expense of the School District. Under such circumstances it should be denied.

The judgment of the circuit court is therefore affirmed. All concur.