GRACE WHITE, RESPONDENT, v. McCoy LAND COMPANY, APPELLANT.
—87 S. W. (2d). 672.

Kansas City Court of Appeals.   June 24, 1935.

Rehearing denied October 7, 1935.

*Roy W. Rucker* and *Fred J. Wolfson* for respondent.

*Scarritt, Jones & North* for appellant.

SHAIN, P. J.—This is an action predicated upon duress. The respondent, hereinafter referred to as the plaintiff, sued the appellant, hereinafter referred to as the defendant, and seeks to recover for money alleged to have been received by defendant from plaintiff by means of extortion, coercion and duress.

It appears from the record herein that on March 23, 1931, the County Court of Jackson County adopted a resolution to submit to the qualified voters proposals to issue certain bonds. On April 21,

1931, said county court adopted a resolution to submit said proposals to the voters at a special election to be held on May 26, 1931. Among these proposals was one "to issue bonds in the sum of $4,000,000 for the purchase of a site and building of a courthouse, in which there should be incorporated a jail, in Kansas City, Missouri, and furnishing and equipping the same." This election was held with the result that the proposal to issue said bonds was carried.

On January 2, 1932, the county court entered an order appointing F. C. Gunn to superintend the erection of the Kansas City courthouse and jail building, and also authorizing him to proceed to select a site for said courthouse and jail building, in Kansas City, Missouri. The superintendent upon the filing of the order appointing him, instantly filed his oath of office.

Thereafter, said F. C. Gunn made selection of a site, in Kansas City, Missouri, consisting of a block of ground bounded on the north by Twelfth Street, on the west by Oak Street and on the east by Locust Street, and on the south by Thirteenth Street. Thereafter, said Gunn duly filed his report and same was approved.

Thereafter, and on January 9, 1932, the defendant herein, as plaintiff therein, brought a suit in equity in the Circuit Court of Jackson County, Missouri, against members of the county court and others to enjoin the issuance and sale of the courthouse bonds and the levying of taxes for the payment thereof. This suit was brought in the Independence Division of the Circuit Court of Jackson County, Missouri.

Thereafter, change of venue was taken and the cause sent to the Circuit Court in Kansas City, Missouri.

Thereafter, demurrer to plaintiff's petition in said equity suit was filed and thereafter was sustained. Thereafter amended petition, entitled "A taxpayer's suit to enjoin the levy of unlawful taxes," was filed.

The record is not clear as to when this amended petition was filed. It appears that motion to strike out portions of this amended petition was passed upon April 6, 1932. It is, however, clearly shown that the pleadings in this equity suit were not made up until April 18, 1932. The record shows that the equity suit was taken up by the court on May 5, 1932, and record was entered as follows:

"Now on this day this cause coming on for trial as an equity cause, come the parties, the cause is submitted, and the court take this cause under advisement."

The defendant in its brief herein designates the above suit as, "A typical taxpayer's suit against the county court and others." The pleadings in that suit attacked the legality of the bond issue; alleged that the judges of the county but made pretense of complying with the statutes; that the members of the court were moved by con-

siderations other than that of obedience to law and with wisdom and consideration of the rights and privileges of citizens and taxpayers and that they did collusively and clandestinely agree between themselves, and with a person to be named as superintendent, to have the courthouse located as aforestated as located. The petition is set out in the record and consists of twenty-nine pages. We conclude that for the purposes of the issues of this case the above brief summary will suffice, with the exception of a quotation stating the general alleged purposes, which are as follows:

"And plaintiff brings this suit in its own name and behalf and also for the use and benefit of other property owners in Jackson County similarly situated who may desire to and shall enter appearance herein and join the purposes of this suit and participate in the costs thereof."

The record discloses that after the site of the courthouse had been determined upon and before the equity suit was brought, options on real estate within the site were secured. One of the options was a ninety-day option with the plaintiff of this suit on property owned by her within said site, described as lots 1109 and 1110 in Block 77 of McGee's Addition in Kansas City, Missouri. This option being under date of December 2, 1931, and based upon a consideration of $70,000.

It appears that long prior to the issues being made up in the aforesaid equity suit, negotiations, between the plaintiff in that suit, defendant herein, and property owners in the site location had been entered into looking to a settlement of the aforesaid equity suit. It further appears that on April 9, 1932, the same being prior to the making up of the issues in the equity suit, a compromise agreement was entered into by and between the plaintiff therein, defendant herein, and the property owners in the location site.

The compromise agreement is so pertinent to the issues herein that we set forth the same in full, as follows:

## "ARTICLES OF AGREEMENT.

"Articles of Agreement, made and entered into this 9th day of April, 1932, by and between McCoy Land Company, a corporation organized and existing under the laws of the State of Missouri, of the first part, and the undersigned property owners, of the second part, Witnesseth:

"Whereas, heretofore Jackson County acquired options to purchase and acquire title to all of the real property comprised in the city block bounded by Twelfth and Thirteenth Streets, Locust and Oak Streets, in Kansas City, Missouri, as and for a site for a new county courthouse and has indicated its willingness to pay therefor approximately $1,010,000; and,

"Whereas, first party has instituted a certain cause in the Circuit Court of Jackson County, Missouri, attacking the proceedings leading up and pertaining to the acquisition of said new courthouse site, numbered 367435, against Jackson County, Missouri, and certain officials thereof; and,

"Whereas, it is mutually desired by and between the said McCoy Land Company and the undersigned property owners to settle said controversy and to finally dispose of said suit;

"Now, therefore, for mutual considerations, it is agreed by and between said first party and said second parties as follows:

"(1) Each of the undersigned property owners is willing to and will, subject to the terms hereof, sell and convey that part of the property aforesaid by him owned, to Jackson County, Missouri, and make a good, clear and merchantable title thereto at and for the price and sum indicated opposite his or her signature, the aggregate of said prices being approximately $1,010,000.

"(2) Each of said owners forthwith will procure from the Kansas City Title & Trust Company a title guaranty policy as to his or her land, in the usual form, in favor of Jackson County, or a preliminary memorandum that it will issue such a policy on stated conditions, and such ownership forthwith will deposit with the said Title Company a good and sufficient deed or deeds conveying his said parcel of real property aforesaid to Jackson County, to be by said Title Company delivered to the said County upon its payment to the said Title Company of the purchase price thereof *herein indicated.* (Italics ours.)

"(3) Upon the deposit of such deed or deeds with the said Title Company by the owner, or by as many of them as are competent to make deeds, and upon satisfactory assurances to the Title Company, that the title of all other owners of property in said block will be acquired, the form of such orders, judgments and decrees to be made and entered in the above entitled cause numbered 367435 as shall be agreeable to the said court and as shall be effectual in accomplishing the final disposition of said cause shall be agreed upon by the parties to said cause, the same to be made and entered in said cause when defendants in said cause shall have entered into an agreement with a solvent bidder to buy such an amount of County Courthouse bonds as shall be sufficient to pay for said lands, and the said first party agrees to acquiesce in the judgment or decree of said court as may be made and entered as above expressed and to refrain from seeking to modify or change the said judgment or decree of said court either by appeal, writ of error or otherwise, and in addition thereto the first party, its agents and attorneys agree not to directly or indirectly institute or cause to be instituted any suit or suits directly or indirectly attacking or seeking to challenge in any way whatsoever

the proceedings of the said County Court providing for the issuance of bonds, the proceeds of which shall be available and/or be used in acquiring the aforesaid new county courthouse site and in constructing a new courthouse thereon.

"(4) The said Title Company is hereby given full and plenary power to and is instructed to disburse the money or funds it may receive on account of each owner as the purchase price of his or her property, to such person or persons as may be entitled thereto, for the purpose of paying off all liens and encumbrances on his or her property and to pay to the said McCoy Land Company a sum equivalent to three and one-half per cent of the full purchase price of his or her said property for the purpose of compromising and settling and disposing of its said suit, and for the other considerations herein expressed, and to pay the balance of such purchase price to the owner or to his or her order; provided, that if this agreement is not consummated to the extent of entering the said judgment or decree and paying the amount of the said three and one-half per cent of the total purchase price to the McCoy Land Company within ninety days from this date either the majority in number of the undersigned owners or the McCoy Land Company may by written declaration to that effect terminate this agreement. Such declaration if made by said property owners to be delivered to McCoy Land Company or its attorneys of record, or if by the McCoy Land Company to any two of said property owners or Henry S. Conrad, their attorney. And time shall be of the essence hereof.

"McCoy Land Company,
"By W. C. Scarritt,
"President.

"Scarritt, Jones & North,
"Attorneys for McCoy Land Company.
"Approved:
"Kansas City Title & Trust Company,
"By Edward J. Eisenman,
"A. Secy."

The property owners signed this contract and after the name of the plaintiff herein there is *indicated*, "1109, 1110, McGee Addition, $70,000.00."

Apropos to the issues presented in this case, it is to be noted that under the terms of the above agreement the plaintiff is required to make and deposit a deed conveying her property to Jackson County for the *indicated* consideration of $70,000, to be delivered to said county upon the payment of the said $70,000, which payment is only conditioned on an agreement with a solvent bidder to buy the bonds, still Jackson County is not a party to the agreement. It is evident, at least, that the parties to the agreement assumed that Jackson County would purchase under its option with the plaintiff.

On May 14, 1932, the Circuit Court of Jackson County, Missouri, entered judgment in aforesaid equity suit for defendant and against plaintiff therein, the defendant herein.

It is evident from the showing in the record that the equity suit was disposed of in accordance with the provisions of the agreement set forth.

We note that while defendant herein agreed to abide by the decision of the circuit court in the equity suit, still after judgment in the quity suit, it filed its motion for a new trial and thereafter the following somewhat unusual entry of withdrawal and declaration of intentions is shown, to-wit:

"ENTRY OF MAY 24, 1932.

"Now comes the plaintiff in the above-entitled cause and, upon its own motion, withdraws the motion for new trial, filed here. Further, this plaintiff announces its intention irrevocably to not proceed further in the prosecution of this cause, and in consideration of the public interest and other considerations, receipt of which are hereby acknowledged, waives any right to appeal from any order issued herein and waives any right it has to sue out a writ of error in the above-entitled cause.

"Plaintiff further acknowledges full jurisdiction in Division No. 9 of the Circuit Court of Jackson County in the rendering of judgment heretofore rendered herein, waives any right of exception, of appeal or the pursuit of any other remedy in the premises. And plaintiff further agrees not to institute or prosecute any other or further proceedings in relation to or affecting the subject matter of the above and foregoing suit."

We have set forth the proceedings in the equity suit somewhat in detail, for the reason of the pertinency of same to the issue in the case at bar. The issues in the case at bar can best be shown by the pleadings.

In the plaintiff's petition after setting forth in brief the proceedings briefly set forth above, the petition avers as follows:

"For her cause of action plaintiff states that on the 2nd day of December, 1931, she executed a written option to Harry S. Truman, as one of the judges of the County Court of Jackson County, Missouri, under the terms of which option she agreed to sell Lots 1109 and 1110 in Block 77 of McGee's Addition in Kansas City, Missouri, for the price and sum of $70,000. That it was understood between the parties at the time and was a matter of public knowledge that the county court was acquiring this property in said block for the purpose of erecting a new courthouse and jail thereon. That thereafter on January 9, 1932, the defendant, McCoy Land Company, acting by and through its president and attorney, William C. Scarritt, filed its bill in equity in the Circuit Court of Jackson County,

Missouri, at Independence, seeking to enjoin Jackson County and the officers thereof from the sale of bonds which had been voted by the taxpayers to provide money for the erection of said new courthouse and jail.

"That when publicity was given to the fact the county court intended to purchase the block hereinbefore described for the purposes mentioned, plaintiff's tenants immediately vacated her property and the income from said property from which plaintiff had been paying the taxes, insurance, and interest on the encumbrance, ceased. That all these facts were well known to the defendants and each of them.

"That the suit brought by the defendant, McCoy Land Company, through its president and attorney, the defendant, William C. Scarritt, was not brought in good faith, but for the purpose of annoying, vexing, hindering and delaying plaintiff in the sale of her property to the county under said option and agreement to purchase. That defendants knew plaintiff was an aged woman dependent entirely for her livelihood upon the income from the property hereinabove described; that the property was heavily encumbered; that the interest on the encumbrance thereon was long past due, that the taxes were delinquent and that, if the sale under the option was delayed, plaintiff would lose her interest in said property by foreclosure. That after the demurrer to the petition of the McCoy Land Company had been sustained, said McCoy Land Company, acting through its president and attorney, William C. Scarritt, demanded that this plaintiff pay to the McCoy Land Company and to the said William C. Scarritt the sum of $2,450, and announced that unless said payment so demanded was made an appeal would be taken from the judgment sustaining the demurrer to the petition of the defendant, McCoy Land Company, so that the sale to the county of plaintiff's property could not be consummated within the time provided in said option. That the demand was oppressive, wrongful, and unconscionable, and made with the knowledge that because of the dire financial situation in which this plaintiff was placed, advantage could be taken of her. That in order to save, for herself, her equity in said property plaintiff agreed to and did pay to the said defendant, McCoy Land Company, a corporation, and to William C. Scarritt, its attorney and president, the said sum of $2,450. That said payment was made under the circumstances hereinbefore set forth, which destroyed the free agency of plaintiff and deprived her of the exercise of her free will. All of which was well known to the defendants and each of them.

"That the conduct of the defendants and each of them amounted to extortion, coercion and duress.

"Wherefore, plaintiff prays judgment against the defendants in the sum of $2,450, and for her costs in this behalf laid out and

1028

expended and for interest on said sum from the 6th day of July, 1932, at the rate of six per cent per annum.''

The defendant's answer is as follows:

''Now come the defendants in this cause and by leave of court first obtained filed herein this their amended answer to the petition and state that since the filing of their original answer herein the parties to this suit have entered into their written stipulation filed in this cause on February 16, 1934, whereby in effect plaintiff's petition was amended by incorporating therein certain articles of agreement dated the 9th day of April, 1932, with the same force and effect as if the said articles of agreement had been set out in plaintiff's petition *in haec verba,* and whereby the said stipulation was and is made a part of the record proper in this cause.

''And further answering defendants admit and state that on or about January 9, 1932, the defendant, McCoy Land Company, instituted a certain suit in equity in the Circuit Court of Jackson County, Missouri, at Independence, being cause No. 76963, wherein said McCoy Land Company was the plaintiff, and Jackson County, Harry S. Truman, W. O. Beeman and E. I. Purcell, judges of the County Court of Jackson County, Harry A. Sturges, treasurer of Jackson County, and Robert L. Hood, county clerk of Jackson County, were and are sole defendants, and said suit was removed to the Circuit Court of Jackson County, Missouri, at Kansas City, and is there known as No. 367435.

''And these defendants say that the said articles of agreement constitute a legal and valid contract between the plaintiff herein, Grace B. White, and said McCoy Land Company founded upon a legally sufficient consideration whereby said Grace B. White bound and obligated herself to pay the said sum of $2,450, being the debt or claim sued for in this action, unto the McCoy Land Company for the considerations expressed in said articles of agreement.

''Defendants further say that the terms and stipulations of the said articles of agreement were faithfully and fully complied with by the said McCoy Land Company and that the said sum, debt or claim of $2,450 sued for or upon in this cause of action was paid over to the McCoy Land Company by the Kansas City Title & Trust Company conformable to the terms of the said articles of agreement and that thereby the said suit of McCoy Land Company against Jackson County et al., was compromised, settled and finally disposed of in compliance with and conformable to the terms of the said articles of agreement, and that by reason of the premises the defendants were and are absolved from any obligation to the plaintiff under the allegations of her petition in this cause.

''Defendants say that the settlement stipulated for' and carried out by and in compliance with the terms of the said articles of agree-

ment is a property right of the McCoy Land Company and if plaintiff be absolved and released from her obligations therein expressed it would deprive the said defendant of its property without due process of law, contrary to the provisions of the Fourteenth Amendment to the Constitution of the United States guaranteeing that no person shall be deprived of his property without due process of law nor deny to anyone the equal protection of the law.

"Defendants specifically deny that said suit of McCoy Land Company as plaintiff against Jackson County et al., was not brought in good faith, and they deny that said suit was brought for the purpose of annoying, vexing, hindering and delaying the plaintiff in the sale of her said property to the county under an option to purchase given or granted by her, and they deny that at the time said articles of agreement were entered into, to-wit, on April 9, 1932, the plaintiff was obligated by any option to convey her real property to Jackson County, and deny that at that time or subsequently until the said articles of agreement were consummated that Jackson County was under any obligation to purchase plaintiff's lands from her or anybody else. Defendants deny each and every allegation of duress.

"Further answering defendants deny each and every allegation in the petition contained.

"Wherefore, defendants pray the judgment of the court."

Trial was by jury resulting in a verdict for the plaintiff in the sum of $2,688.87. Judgment was entered in accordance. and defendant has appealed.

The defendant makes assignments of error as follows:

"I.

"The trial court erred in overruling the demurrers to the evidence requested by defendants, and each of them.

"(a)  Because the plaintiff so ratified the contract, claimed to have been executed under duress, as to make it a binding obligation.

"(b)  Because plaintiff seeks to treat as repudiated or rescinded a contract without placing, or offering to place, the other party *in statu quo*.

"(c)  Maintenance of McCoy Land Company's equity suit was not an unlawful act.

"(d)  Because plaintiff's evidence failed to show duress, as defined and declared by the authoritative decisions.

"II.

"The trial court erred in admitting the following evidence:

"(a)  Testimony of Mr. Neel and of Mr. Huselton and of Mrs. White concerning statements and conversations by third persons, not in the presence of defendants; such statements being hearsay and not binding upon defendants.

". "(b)   The testimony of Mrs. White as to Mr. Conrad's opinion as to whether or not McCoy Land Company could maintain its equity suit.

"(c)   Evidence concerning the transactions and minutes of meetings of McCoy Land Company.

"(d)   The testimony of Mrs. White as to her condition and that of her property, absent any evidence that such conditions were made known to defendants.

## "III.

"The trial court erred in giving plaintiff's Instruction No. 1.

"(a)   Because said instruction was not supported by or based upon any competent evidence.

"(b)   Because said instruction assumed untrue or unproven facts.

"(c)   Because it contains improper commentaries on the evidence.

"(d)   Because said instruction submitted questions of law to the jury.

## "IV.

"The court erred in giving plaintiff's Instruction No. 2, defining 'duress.'

## "V.

"Plaintiff made no case against defendant, W. C. Scarritt, and the trial court erred in refusing his separate demurrer to the evidence."

William C. Scarritt, a codefendant, herein has filed separate appeal and, as to said codefendant, his appeal will be disposed of in a separate opinion.

## OPINION.

In passing upon the defendant's first specification it requires a careful study of all the evidence, and, only the evidence most favorable to the plaintiff can be considered by us.

The record discloses that throughout the various proceedings shown in the record herein all parties have rather freely cast aspersions upon the character and conduct of persons concerned. We but deem it our duty in passing upon the issue, as presented in defendant's assignment one, to confine ourselves to the issue as to whether the evidence justifies a submission of the case to a jury and, if so, to accept the finding of fact as made by the jury, regardless of what our conclusions would be if we were triers of fact.

The plaintiff introduced in evidence the records concerning the bond issue and site location and compromise agreement, all of which are summarized and set forth above.

The plaintiff called as a witness Henry S. Conrad, an attorney, in the negotiations to compromise agreement. His testimony was partly as follows:

"Q. For what purpose were you employed by these people? A. I was employed initially for the purpose of looking into the law, investigating it, and to see if I could find authorities which I could use which would convince Mr. Scarritt for the McCoy Land Company that their suit should be dismissed and in a more or less passive way to keep track of the litigation as it went along.

"Q. Did you in pursuance to that employment go into the authorities for determining, if you could, whether there was substantial basis for the suit which had been stipulated? A. I did not go into it exhaustively, but I went into it to the extent that I was satisfied to take the matter up—

"MR. NORTH (Interrupting): Just a minute—I thought you were going to draw a conclusion.

"A. Oh, no, no. I was satisfied I was justified in taking the matter up with Mr. Scarritt.

"Q. (MR. RUCKER) Did you reach a conclusion based upon your knowledge of the law and the investigation of the authorities with reference to whether or not Mr. Scarritt could successfully maintain that suit?

"MR. NORTH: I object to that question as calling for a conclusion on a matter that is not subject to expert testimony.

"THE COURT: Overruled.

"(To which ruling of the court the defendants by their counsel then and there duly excepted at the time and still except.)

"A. I did not in that sense. I reached a conclusion assuming that the suit was not well founded as to what I thought might be the liability of the McCoy Land Company and possibly Mr. Scarritt, its president.

"Q. (MR. RUCKER) Well, do you mean by that that you advised your client with reference to whether or not in your opinion Mr. Scarritt could maintain that suit ultimately?

"MR. NORTH: I object to that question as leading.

"THE COURT: Overruled.

"(To which ruling of the court the defendants by their counsel then and there duly excepted at the time and still except.)

"A. No, I never went into the suit, Mr. Rucker, at that time to the extent of determining the merits of Mr. Scarritt's suit. I did go into it for the purpose of contending with him that if his suit was not well founded that he and his company would be liable to damages and I asserted possibly punitive damages.

"Q. You were employed after the demurrer had been sustained, were you not—or prior to that time? A. I would not be accurate on that.

"Q. Did you know that a demurrer had been sustained to his

petition? A. I know it now and whether I knew it at that time or not I can't be certain.

"Q. Now did you take up the matter of dismissing this suit with Mr. Scarritt? A. I did.

"Q. Were you successful in your efforts to get him to dismiss it? A. No, sir.

"Q. At the time you took it up with him had you been authorized by your clients to enter into any money negotiations for settlement with him? A. I had not.

"Q. Who suggested any money settlement or any sum? A. I was the one.

"Q. In what way, how did you suggest it? A. I had a conference with Mr. Scarritt on the proposition I have outlined to you and he said 'Well, if you have some authorities on it I would be glad to have you submit them to me.' I went back and wrote him a letter, as I recollect, outlining the authorities and then I went to see Mr. Scarritt and he took the position that the authorities were not applicable. As might be expected, he and I differed on that matter. We were on opposite sides. Now, how soon it was after that I do not know, but some matters arose with reference to my own clients that caused me to—

"Q. (Interrupting) What were those matters?

"THE COURT: Mr. Conrad, if you please, just limit it to Mrs. White.

"Q. (MR. RUCKER) With particular reference to Mrs. White. A. Yes. Mrs. White, as I recollect it, had a mortgage on her property. The taxes had not been paid; rents were extremely uncertain, and I figured the matter over and I reached the conclusion myself that her condition and others—

"Q. (Interrupting) Hers is all we are interested in. A. Hers was one of the moving matters—caused me to believe that if the situation rested as it was then until it could be litigated through the courts, she was in great danger of losing the property, and because of that I felt it was my duty to see what I could do to avoid that, although at that time I had no authorization to do it.

"Q. (MR. RUCKER) All right, what did Mr. Scarritt—what reply did Mr. Scarritt make, if any, to your suggestion that the matter might be settled? A. He called in his associates, Mr. Jones and Mr. North, as I recollect it, and their talk before me was not in entire harmony as to what might be considered about it, but the result of it was that a discussion was had as to the terms or basis upon which a settlement might be arrived at.

"Q. Well, what was the term that he suggested?

"MR. NORTH: Just a minute, if the court please, I would like to ask a qualifying question.

"THE COURT: Yes.

"MR. NORTH: Those negotiations resulted in a written agreement being signed by Mrs. White? A. That is correct, bearing date April 9th, as I recollect it.

"MR. NORTH: Is this a photostatic copy of the agreement shown in the stipulation filed in this court in this case on February 16, 1934? A. Seemingly. I am reasonably sure that it is.

"MR. NORTH: But there was a written agreement? A. Yes, there was a written agreement. It bore that date and I am sure that is a copy of the contract.

"MR. NORTH: We object to any testimony on conversation leading up to the written agreement on the ground it is all merged in the written agreement and it would be incompetent, irrelevant and immaterial to any issue in the case.

"THE COURT: Overruled.

"(To which ruling of the court the defendants by their counsel then and there duly excepted at the time and still except.)

"Q. (MR. RUCKER) Go ahead. A. Mr. Scarritt suggested that if the lot owners would pay—I don't remember the percentage, but it amounted to approximately $100,000.

"Q. Did you submit that proposition to the property owners? A. I did not.

"Q. Was there any further negotiations between you and Mr. Scarritt with reference to it? A. Yes, yes. You understand I do not undertake to be exactly chronological. This covered a considerable period of time, but there were further negotiations leading up to this document which was signed.

"Q. Did Mr. Scarritt make any further suggestions of amounts? A. Yes.

"Q. What was the second suggestion? A. The second suggestion as I recollect it was $50,000.

"Q. Did you submit that to your clients? A. I did.

"Q. Now at the time you submitted that to your clients I am asking you now with particular reference to Mrs. White, the plaintiff in this lawsuit, did you advise Mrs. White that Mr. Scarritt might appeal from the order of the Circuit Court of Jackson County, Missouri, and prolong that litigation over a period of at least a year? A. Mrs. White was present when I made those observations to the property owners.

"Q. So that was communicated to her? A. Oh, yes, she was present.

"Q. Did you know of any way by which you could prevent Mr. Scarritt from appealing that case? A. I knew no way of preventing him from appealing that case. I told them that the cause might be advanced on the docket by the Supreme Court, and being a matter

more or less public I thought it might be, but I knew of no way to cut off the appeal.

"Q. Even if it were advanced on the Supreme Court docket when could it have been reached? A. I can't be certain, but I had in mind and I think I said that if it was advanced it would probably be decided in about a year.

"Q. In about a year? A. Yes.

"Q. Did you receive any information to the effect that the county court was more or less upset about this matter? A. I don't know what you mean.

"Q. I mean that they were likely perhaps not to go forward with the proposed purchase of this property unless something was done to— A. (Interrupting) I had no definite dealings with them. I heard a great deal.

"Q. Through any officer of the county court? A. I talked to no one but Fred Boxley, county counselor.

"Q. Did you get some information of that nature from him? A. I think so, but you know when there is so much talk I could not be definite about it.

"Q. If you did have such information did you pass it on to your clients? A. That was discussed among us that that condition prevailed.

"Q. That was considered by your clients? A. It was considered that the site might be abandoned, yes.

"Q. Did you have any talk with any of the mortgage holders that held mortgages on Mrs. White's property? A. By telephone.

"Q. With whom did you talk? A. I called Frank Groves of the Groves Mortgage Company and told him I was advised he was threatening to institute foreclosure proceedings and I stated in substance that if he undertook to do so while this matter was pending I would endeavor to enjoin the sale.

"Q. But she was threatened with foreclosure? A. That is the information I had. I don't know how I got it.

"Q. Were all those matters taken into account by Mrs. White before she made up her mind to sign this agreement? A. I don't know what she took into consideration. I know what was presented at the conferences.

"Q. Were those things presented in conferences? A. They were discussed by all the lot owners, yes.

"Q. Now, Mr. Conrad, you represent a number of clients who deal in Kansas City real estate, do you not? A. I represent some, yes.

"Q. Was there any ready sale for real estate in Kansas City at that time near the location of this new courthouse? A. I could not find any. I had some for sale. I don't think so.

"Q. Finally now, you prepared this contract which was presented to you—a photostatic copy? A. I made the original draft of that contract, and I think the final draft. Of course, there were suggestions made in the interim.

"Q. Under the terms of that contract, Mr. Scarritt finally agreed to take three and one-half per cent of the gross sale price? A. That is my recollection.

"Q. And that was deducted— A. (Interrupting) That was handled by the Kansas City Title & Trust Comany. I understand that is the course pursued.

"Q. Now do you know whether when this matter was first broached Mrs. White expressed any willingness to pay Mr. Scarritt out of the money that was coming to her? Did she want to do that? A. Of course, none of them wanted to do it.

"MR. RUCKER: That is all."

On being recalled, Mr. Conrad testified as follows:

"THE COURT: Mr. Conrad, I believe you said to the court that there were some statements you wished to make in addition to your testimony yesterday.

"MR. CONRAD: Upon adjournment yesterday afternoon there was some discussion between counsel about my fee in this matter and as a result of that I volunteered to come here this morning and state the facts about it.

"Toward the close of the negotiations in this matter of settlement I called attention of the property owners who were assembled that I had been in conference with Mr. Scarritt and the representatives of the McCoy Land Company numerous times from the time I was first brought into the matter, which was about the first of February —I think a little before—up until that time, which was in the early part of April. That I had been holding many, many conferences with the county counselor and of course with the lot owners; that I had been giving more or less attention to the matter throughout those two or three months; that my initial employment did not cover services rendered in this settlement, and I stated to them that possibly—that I should have compensation for those services and that possibly when I reached the minimum sum that the McCoy Land Company or Mr. Scarritt's office would take I could prevail upon them to pay the fee rather than calling on the lot owners. They assented to that. Some of them were very emphatic that that should be done. In the conference in Mr. Scarritt's office Mr. Scarritt was present and Mr. Jones and Mr. North. The matter went on for some little bit and they told me to leave the room, and I went into Mr. Jones's room, the previous conference being in Mr. Scarritt's room, and when I came back, they told me this was their ultimatum as to the amount of settlement, which was this three and one-half per

cent. I was then convinced that they were sincere in that statement, and I have had no reason to change my view since. We then discussed the matter as to whether or not they could pay me out of this sum they named, some compensation, with the result that they told me when the matter was all closed up they would pay me $5000. Later when it was all closed and some time in the month of July, I do not know the exact date, the check was sent to me and I acknowledged it by letter through the mail.

"Q. (MR. RUCKER) What did the property owners pay you by way of fee? A. The property owners were to pay me $1000. It wasn't paid. I forget how much was paid on that initial employment to look into the law with reference to the suit.

"Q. Didn't they pay you $1000 and $250 for expenses? A. No.

"Q. Well, Mrs. White paid you her part of the— A. (Interrupting) That is true.

"Q. (Continuing)—of a fee in that amount. The plaintiff in this lawsuit? A. I will say this: that some of them did and if Mrs. White said she did, that is true. A number of them did not pay.

"Q. Did you attempt to enforce it against them? A. No, after this matter was closed up and the arrangements made with Mr. Scarritt, I did not try to enforce it.

"Q. You did tell Mrs. White that Mr. Scarritt paid you $5000? A. I don't remember telling Mrs. White any sum, but I told all of them that Mr. Scarritt had agreed—or the McCoy Land Company—to take care of the fee and that therefore there would be no charge made.

"Q. When did you tell them that? A. That was told to them after we had agreed on the terms of settlement we were getting.

"Q. What had you told the property owners your fee would be? A. The amount of the fee was not discussed. It came up, as I have told you, in that conversation that I should have a fee covering this and that then it was that they told me—and some of them—I could tell you the names—were very insistent that I should urge Mr. Scarritt—

"Q. (Interrupting) I am speaking with particular reference to Mrs. White. You did not at any time advise Mrs. White that Mr. Scarritt had paid you $5000? A. I don't remember telling Mrs. White that, but I told the rest of them that no further charge would be made because Mr. Scarritt had taken care of the fee.

"Q. But Mrs. White paid you in full on the basis of the fee which you had charged the property owners, or rather Mrs. White had paid you her full *pro rata* part of that fee? A. For the initial employment if she says she did, she did.

"Q. That was a $1000 fee and $250 for expenses? A. Yes, that is it.

"Q. What expenses did you have? A. Well, I don't know what—

"THE COURT: (Interrupting): That is not material.

"MR. RUCKER: All right, that is all. A. My books will show everything.

"THE COURT: But it was agreed upon? A. Yes. Anybody who wants my books can have them.

"MR. RUCKER: That is all."

The plaintiff testified in her own behalf that she was a widow aged seventy-four years, that she owned the property, described aforesaid, and that she had executed the ninety-day option as aforesaid set forth. Her testimony was further to the effect that she had an encumbrance on her property of $24,000 that was past due and that foreclosure proceedings were threatened. Her testimony was further to the effect that after location of courthouse site was made public that revenue on her property was much reduced.

According to plaintiff's testimony, she first heard of the injunction suit in January, 1932, and that thereafter she met with other property owners in the site and was a party to the employment of Mr. Conrad. Her testimony was to the effect that Mr. Conrad reported to meetings that she attended concerning consultations with Mr. Scarritt that led up to the compromise agreement and that Mr. Conrad advised that the injunction suit could not be maintained, but that by the usual court proceedure, including an appeal, the whole proceeding could be indefinitely held up.

As to plaintiff's willingness and reactions to the compromise, the following questions and answers are pertinent, to-wit:

"Q. (MR. RUCKER) Were you willing or not? A. I was not willing. I was very unwilling.

"Q. That is all I asked. Were you willing? Now, subsequently and finally, did you agree to sign a contract whereby Mr. Scarritt was to receive three and one-half per cent of the sum that the county was going to pay you? A. I did sign the contract.

"Q. You did do that? A. Yes.

"Q. Did you sign the contract? A. Yes.

"Q. What induced you to sign that contract, Mrs. White? A. I signed it because I had to pay that amount of money or lose my entire property. I could not hold it.

"Q. (MR. RUCKER) Is that the only thing? What were the elements that entered into your conclusions? A. I could not hold the property.

"MR. NORTH: Same objection, of course.

"THE COURT: Yes, sir.

1038

"(To which action and ruling of the court the defendants, and each of them, then and there duly excepted at the time and still except.)

"A. And by paying Mr. Scarritt what he demanded he allowed the bonds to be sold and I made the sale.

"Q. (MR. RUCKER) Did your age have anything to do with it? A. Very much.

"MR. NORTH: I object to that as leading.

"THE COURT: Overruled.

"(To which action and ruling of the court the defendants, and each of them, then and there duly excepted at the time and still except.)

"A. I was getting older and I was not strong.

"Q. (MR. RUCKER) Go ahead. A. Taxes were higher, insurance was very high on the garages, and I was threatened with foreclosure. I was behind with my interest payments and threatened with foreclosure.

"Q. (MR. RUCKER) Were you threatened with foreclosure? A. Yes.

"Q. (MR. RUCKER) Did that have anything to do with your signing the contract? A. It had everything to do with it.

"Q. Was anybody present besides Mr. Huselton and his stenographer? A. No, sir; not at that time.

"Q. (MR. RUCKER) What was your mental and physical condition?

"MR. NORTH: Same objection.

"THE COURT: Overruled.

"(To which action and ruling of the court the defendants, and each of them, then and there duly excepted at the time and still except.)

"Q. (MR. RUCKER) Go ahead now and tell the jury. A. Well, I knew if I did not—

"Q. (Interrupting). No, I did not ask you that. I asked you what your condition was, mental and physical? A. Well, I was a wreck.

"Q. What do you mean by 'wreck?' That doesn't mean anything. A. It means a lot to one who has it. I was sick with anxiety and fear that we should not be allowed to make the sale.

"Q. That what would happen to you? A. I would have lost my property—all of it."

At the close of plaintiff's evidence, the defendant interposed demurrer, which was overruled, and thereafter the defendant introduced documentary evidence to complete showing of proceedings in the injunction suit, the substance of which is set out above.

There is evidence shown to the effect that representatives and stockholders of the defendant herein participated with the proponents of the courthouse bond issue and also evidence to the effect that defendant's representatives, after the bond issue had been certified as having carried, were active in efforts to influence the selection of a site that would have been to advantage of its property interests.

William C. Scarritt, a codefendant herein, testified on behalf of defendant as follows:

"Q. You did most of the legal work on this matter yourself, didn't you? A. I was the directing mind.

"Q. You were the general? A. I was the directing mind. I had the assistance of others who aid me in getting things."

Mr. Scarritt further testified that he and his brother owned over one-half of the stock in the defendant company. Mr. Scarritt in his testimony estimated that the property in Jackson County on which taxes would be levied to take care of construction of the courthouse and jail was approximately six hundred million dollars. Mr. Scarritt did not know what was the assessed valuation of the property of defendant and the record is silent as to the amount.

It is shown that the amount paid to the defendant under the compromise agreement was $35,350.

In the above summary we have endeavored to present the evidence most favorable to the plaintiff. In the consideration of this evidence, we must consider the fact that common law duress has been materially departed from in the United States, in that duress of property or moral duress now receives full sanction of law.

In Corpus Juris, volume 13, page 396, paragraph 310, subhead E, duress is defined as follows:

"Duress is that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or in apprehension to overcome the mind of a person of ordinary firmness. It consists not merely in the act of imprisonment or other hardship to which the party was subjected, but in the state of mind produced by those circumstances, and in which the act sought to be avoided was done. Of course the agreement must have been entered into because of the imprisonment, or of fear of the threatened injury or imprisonment; otherwise there is no duress."

In the same volume, page 402, paragraph 310, the modern doctrine is declared to be as follows:

"The rule as it now exists is that the question of duress is one of fact in the particular case, to be determined on consideration of the surrounding circumstances, such as age, sex, capacity, situation, and relation of the parties; and that duress may exist, whether or not the threat is sufficient to overcome the mind of a man of ordinary courage, it being sufficient to constitute duress that one party to

1040

the transaction is prevented from exercising his free will by reason of threats made by the other, and that the contract is obtained by reason of such fact.''

The modern doctrine of duress is recognized by the courts of Missouri. [Wood v. K. C. Home Tel. Co., 123 S. W. 6, 223 Mo. 537.]

From a careful study of the evidence we have outlined above, we conclude that there is evidence from which the jury could infer and conclude that the taxpayers' injunction suit brought by the defendant, was not brought in good faith, in that it might be inferred from all facts and circumstances in evidence that the purpose was to the end accomplished to-wit: The collection of $35,350 from the property owners. In other words, for the purpose of securing such pecuniary profits as would arise from a settlement with the property owners situated as the evidence shows plaintiff to have been. The alleged self-interest in the defendant in bringing the injunction suit was to avoid alleged illegal taxes on its property. No showing of the assessed valuation of its property is made. Further, while the petition purported to be for the interests of other property owners, who were invited to join, still it is shown that the defendant with no showing of regard for other property owners, shortly after suit was filed, proceeded in negotiation for compromise which resulted in a compromise agreement wherein $35,350 thereafter inured to its own benefit. It is significant that this agreement was entered into before the pleadings were made up in the suit brought by it.

It might be inferred that the interests of other property owners, invited to join, were ignored and based upon absence of showing in the record there is a possibility that the $35,350 taken and appropriated by it might be in excess of its due as based upon the valuation of its property, and therefore there be included in the amount something due to the other property owners in whose behalf the suit was also alleged to be brought.

The above being considered with the fact that the jury in the case at bar found for the plaintiff, we must for the purposes of this review, proceed upon the theory that the compromise agreement in the taxpayers' injunction suit was illegal and in violation of public policy.

This brings us to the question as to whether or not the evidence makes a case for the jury on the issue of duress. Moral duress is characterized by imposition or oppression of any kind by which undue advantage of business or financial stress or the weakness or necessities of another is so taken advantage of as to result in material loss occasioned by such imposition or oppression.

We conclude that, taking the evidence in its most favorable light to the plaintiff, an issue of fact on duress was made for the jury.

Again, concluded by the finding of fact by the jury, we must proceed upon the theory that there was duress as a matter of fact.

It follows that the plaintiff was entitled to go to the jury unless barred by law from the recovery by reason of her own conduct in the premises.

Predicating our further consideration upon the findings of fact by the jury, we are confronted with a situation from which we conclude that the whole proceedings, including compromise in the taxpayers' suit, was against public policy and therefore illegal. It follows that as the plaintiff, having participated in the settlement, also acted in violation of public policy.

In matters of public policy our courts are confronted with a duty that is paramount to the pecuniary interests of litigants and it is our duty herein to heed that higher duty.

The defendant in its briefs cites much authority and quotes therefrom on the question of what constitutes violation of public policy. We must be guided in our considerations herein by the declarations of our own courts and we embrace herein a quotation from a citation found in the defendant's brief. In State ex rel. v. Dirckx, 211 Mo. l. c. 580, and later reiterated in, In re Rahn, 316 Mo. 492, the court says:

"It has been said by the courts of great ability, 'When we speak of the public policy of the state we mean the law of the state, whether found in the constitution, the statute or judicial records.' [People v. Hawkins, 157 N. Y. l. c. 12; Vidal v. Girard's Exrs., 2 How. (U. S.) 127; Dammert v. Osborn, 140 N. Y. l. c. 40.] Respecting the sources of public policy, it is aptly said in Swann v. Swann, 21 Fed. l. c. 301: 'Vague surmises and flippant assertions as to what is the public policy of the state, or what would be shocking to the moral sense of its people, are not to be indulged in. The law points out the sources of information to which courts must appeal to determine the public policy of a state. The term, as it is often popularly used and defined, makes it an unknown and variable quantity —much too indefinite and uncertain to be made the foundation of a judgment. *The only authentic and admissible evidence of the public policy of a state on any given subject is its constitution, laws and judicial decisions. The public policy of a state, of which courts take notice, and to which they give effect, must be deduced from these sources.*'"

We conclude that when public improvements are in contemplation and legal steps are being taken by the proper officials to the end in view that any suit to enjoin the proceedings, wherein it is shown that the suit was not for the public welfare but for the accomplishment of some self interest, then there is presented a situation as to public policy that comes within the scope prescribed by the

opinion in the Dirckx case, supra. As to the application of the principles of public policy in this case, the issue of fact as to the good faith in the injunction case was submitted to the jury under evidence that we conclude made the submission proper. In view of the finding of fact by the jury, we conclude that the question of public policy is before us for consideration in the case at bar.

Having concluded that question of public policy is involved herein, we approach a phase of this case that, in so far as our research goes, presents a question of first impression in this State.

Based upon our conclusions as above stated, all parties to this suit have violated principles of public policy. The question therefore arises as to whether this court is in a position to so dispose of the matters as to do our duty in respect to necessity of supporting the public interest or policy. The general doctrine is to the effect that the plaintiff, having violated public policy, cannot recover. If the general rule applies herein the plaintiff's suit must fail and thereby violation of public policy go unredressed.

We search in vain for a Missouri authority directly in point. So failing, we search the writings of eminent text writers and the opinions of eminent jurists of other states, to the end that this court may, if possible, meet the necessity of maintaining public policy.

Apropos to the situation is the application of the saying that, "When the reason of a rule ceases the rule ceases." Based upon the above principle, many exceptions to general rules find approval by our courts.

In our research, we find that the appellate courts of Illinois have had cases up for consideration that bear very close analogy to the issue as presented in the case at bar.

In Rees v. Schmits, 164 Ill. App. 250 to 260, a similar situation as is in this case was before the court. Rees, under contract founded upon city ordinance, had constructed a sewer. Prior to culmination of his contract, Schmit et al. brought taxpayers' suit to restrain payment. The petition alleged wrongful construction and fraud upon taxpayers and relief was prayed on behalf of themselves as taxpayers. The plaintiffs in the restraining suit began negotiation with Rees to dismiss the suit for a consideration to them. A compromise settlement was reached and money paid to the plaintiff conditioned upon termination of suit favorable to Rees. The court, without hearing evidence on the issue, made entries allowing payment to Rees. Thereafter Rees brought suit in equity for return of moneys paid and the suit for recovery was predicated upon duress.

The issue and the conclusions of the court, in the above case, are best expressed in the opinion as follows:

"Moral duress consists in imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress

or extreme necessities or weakness of another; the theory under which relief is granted being that the party profiting thereby has received money, property or other advantage, which in equity and good conscience he ought not to be permitted to retain. [R. Co. v. Coal Co., 79 Ill. 121; Pub. Co. v. Press Association, 114 Ill. App. 241.] It seems too clear for argument that the transaction in question was contrary to public policy, and therefore illegal.

"It is also true, as contended by counsel for the defendants, that as a general rule, the law will not aid either party to an illegal act, but will leave them without remedy as against each other. [Compton v. Bank, 96 Ill. 301; Critchfield v. Paving Co., 174 Ill. 466; Doane v. Ry. Co., 160 Ill. 22.] Such rule is, however, subject to the qualifications stated in 2 Pomeroy's Equity Jurisprudence, 459, in the following language: 'When the contract is illegal, so that both parties are to some extent involved in the illegality,—in some degree affected with the unlawful taint,—but are not *in pari delicto*,—that is, both have not with the same knowledge, willingness and wrongful intent engaged in the transaction, or the undertaking of each are not equally blameworthy,—a court of equity may, in furtherance of justice and of a sound public policy, aid the one who is comparatively the more innocent. Inequality of guilt exists when the contract is intrinsically illegal, and is of such a nature that the undertakings or stipulations of each, if considered by themselves alone, would show the parties equally in fault, but there are collateral and incidental circumstances attending the transaction and affecting the relations of the two parties which render one of them comparatively free from fault. Such circumstances are imposition, oppression, duress, threats, undue influence, taking advantage of necessities or weakness, and the like.' This doctrine is announced with approval in Baehr v. Wolf, 59 Ill. 470, and Paige v. Hieronymous, 180 Ill. 637."

The above case was in equity. However, as equity follows the law, we conclude that what is said can as well be said in a suit at law. Evidently the Illinois court thought so, for in the opinion the court quotes from the opinion in Evans v. Funk, 151 Ill. 650, a jury case, as follows:

"But this general rule has its exceptions arising out of necessity or from unyielding principles of public policy or from the different conditions of the parties. The different degrees of turpitude, immorality or illegality may be so great between different persons engaged in such acts that the general rule will bend to meet the demands of such case and allow a recovery. In Story's Equity Jurisprudence, section 300, it is said that, 'in case where both parties are *in delicto*, concurring in illegal acts, it does not follow that they are *in pari delicto*, for there may be, and often are, very different degrees in their

guilt. One party may act under circumstances of oppression, imposition, hardship or undue influence, or great inequality in conditions of age, so that his guilt may be far less in degree than that of his associate in the offense. And besides, there may be, on the part of the court itself, a necessity of supporting the public interest or policy in many cases, however reprehensible the acts of the parties may be.' "

We here state, that outside of the Illinois opinions, we find no cases where the doctrine therein stated is as clearly set forth and given application. On the other hand, we find no other reported case wherein there is so close an analogy in the facts and issues herein as in the. Illinois cases, supra.

In the case at bar there is this distinction from the Illinois case; herein there is an option, therein there was a definite contract. The defendant in its brief urges. this distinction. The evidence in this case shows that sale under the exact terms of the option was consummated after the obstruction of the injunction suit was removed. We may conclude from the evidence in this case, the terms of the compromise agreement also considered, that defendant acted upon the theory that the county would carry out the option, contract. The matters considered, we conclude that the distinction does not eliminate the principle involved.

The defendant further complains that opinions by the appellate courts of Illinois are not considered as declaring the law in that State. Granted all that defendant claims, it is shown that the appellate court but reiterates the declaration of law of Illinois as declared by the Supreme Court of that State. [Baehr v. Wolf, 59 Ill. 470; Paige v. Hieronymous, 180 Ill. 637, and 151 Ill. 650, supra.]

In consideration of the evidence concerning the plaintiff's state of mind, her age and condition in life, her situation as to her property interests, and the circumstances of the whole transaction as shown by the evidence, we conclude there is produced evidence from which it may reasonably be inferred that plaintiff was not equally guilty with defendant in the transactions detailed in evidence, wherein the jury has found same to be illegal.

While, as before stated, we find no Missouri authority on all fours with the declarations found in the Illinois cases, supra, still we do find that the courts of this State have given recognition of the exception to the general rule wherein the parties are not shown to be *in pari delicto.* [Suits v. Taylor, 20 Mo. App. 1. c. 173; Green v. Corrigan, 87 Mo. 359, 1. c. 370; Kitchen v. Greenabaum, 61 Mo. 1. c. 116.]

In the case of Green v. Corrigan, supra, 1. c. 370, is found the following quotation:

"In cases where both parties are *in delicto,* concurring in an illegal act, it does not always follow they stand *in pari delicto,* for there may be and often are very different degrees in their guilt. [Story's Eq., sec. 300.] The maxim, '*in pari delicto potior est conditio defendentis et possidentis,*' is not of universal prevalence. Another exception arises where the parties to the transaction, although concurring in the illegal act, are regarded as not equally guilty in consequence of fraud, oppression, imposition or hardship practiced by one party upon the other, thereby attaining an unconscionable advantage."

In Kitchen v. Greenabaum, supra, l. c. 116, the following is shown:

"Instances have also occurred where both parties were *in pari delicto,* in which redress has been afforded. This, however, has been done only when the controlling exigencies of public policy have demanded that aid should be thus granted."

We, therefore, conclude that the exception to the general rule should be applied to the case at bar for the reason of the manifest justice in the principles announced and for the further reason that otherwise this court could not meet its duty of maintaining public policy in the way we conclude it is our duty to maintain in cases wherein the parties are not *in pari delicto.*

It follows that unless there is some other reason than that contained in defendant's specification, one (a), no reversible error presents to the act of the court submitting the case to the jury.

Under subhead (b), defendant complains as to not placing it *in statu quo.* As to that question, we ask: What is there to restore? Certainly in the light of the verdict of the jury the plaintiff received nothing of value from the defendant that can be restored. Under the verdict and judgment in this case, the payment back of the money received places the plaintiff and defendant in the same position they were in before defendant brought its taxpayers' suit. We conclude that the principle laid down in Maupin v. Missouri State Life Ins. Co., 214 S. W. 398, finds application herein.

As to defendant's one (c), the question as to whether injunction suit was lawful or not, we have determined there was an issue of fact, and the jury has spoken. Again, the record discloses that the defendant in the trial below so considered by submitting the issue in its Instruction H.

As to point one (d), as stated above, we conclude duress was an issue of fact, and as to that the jury has spoken. Defendant's claim of error number two is as to admission of evidence.

As to witness Neel, the records referred to shows no objections or exceptions. As to witness Huselton, the assignment is indefinite unless directed to the whole of his testimony. There was objection and exception to him testifying because he was in the court room after

rule was invoked. It appears he was very deaf and we conclude the court did not violate discretion in permitting him to testify.

The testimony of Mrs. White, plaintiff herein, was objected to as hearsay. She was permitted to testify as to conversations with Mr. Conrad when no representative of defendant was present. Mr. Conrad is shown to have been the go-between in matters of the compromise and is shown to have been paid $5000 for his services by the defendant. Under the facts shown, we conclude there was no reversible error in the admission of the testimony.

The admission of the records of the McCoy Land Company we conclude were admissible as to issues presented concerning the compromise agreement.

The claim of error made in defendant's two (d), under other circumstances than disclosed by the evidence herein, would require consideration. However, there is evidence in this case of threats made by defendant, in the negotiations for compromise, concerning tying up the program for the public improvement involved, by procedure conducive to the law's delay which presents a condition, based upon the evidence, from which a jury might infer that defendant had such knowledge of conditions confronting landowners in the site, plaintiff included, as would induce the defendant to make the threats as a means of coercion to the property owners, plaintiff included. Further, Mr. Scarritt, when called on the stand, testified as follows: "Our discussion was very general as to what the attitude of the McCoy Land Company was and what the attitude of his clients was. We went over the whole field just like good lawyers would and I think to know what the situation was and what the rights and claims of each were." We, therefore, conclude that as to the case at bar defendant's point two (d) is not well taken.

The defendant's third claim is as to plaintiff's instruction number one.

The specifications of error are general and indefinite. Wherein the instruction is not based upon competent evidence is not designated. What were the untrue and assumed facts, are not pointed out.

As to subhead (c), no improper comments are pointed out, and as to (d), wherein questions of law are submitted are not indicated. The defendant assumes and states abstract proposition as true and then cites authority to sustain its stated assumptions.

From our examination of the instruction, we see no justification for defendant's assumed conclusions and we conclude that the instruction does not present reversible error.

In defendant's fourth claim, complaint is made as to instruction number three for plaintiff. The instruction reads as follows:

" 'Duress' may be said to exist whenever one, by the unlawful act of another, is induced to make a contract or to perform some other act under circumstances which deprive him of the exercise of free will."

An examination of the Missouri cases cited by defendant on this point reveals that the first is a suit on an insurance policy. The second case is not found reported where cited; the third is an assault and battery case and the fourth is a suit against a railroad company for double damages for killing stock. The New York case cited presents a criminal case based upon fraud of defendant.

There is nothing in these cases that sustains defendant's point four.

We conclude that the instruction presents a correct definition of duress under the modern doctrine in force in Missouri. We find no error in the instruction.

Defendant's point five goes as to the separate appeal filed by W. C. Scarritt and presents no issue as to the case now under consideration. Based upon reasons and conclusions above stated, the judgment is affirmed. *Trimble, J.,* concurs, and *Bland, J.,* concurs in result.

### On Motion for Rehearing.

SHAIN, P. J.—In motion for a rehearing the defendant, the appellant, makes claim that in the opinion handed down by us that all the questions presented have not been decided. This case presents grave questions of public and private interest and with a desire to fulfill our whole duty touching all issues presented, we conclude to hand down this opinion on rehearing.

The record herein is somewhat voluminous and in addition to an original brief of 104 pages, wherein five assignments of error are made, the defendant has filed, on motion for rehearing, a brief of forty pages, wherein there is made presentation under eight suggestions in support of its motion.

In the first suggestion it is claimed that this court in its opinion has completely overlooked the question of "ratification."

An examination of the record discloses that the defendant in its answer filed herein makes no defense based upon "ratification," no instruction on the issue of ratification was asked or given and the defendant in its motions for a new trial and in arrest raises no question of ratification.

The question of ratification was, however, presented in defendant's first brief filed herein. The issue was presented in connection with defendant's assignment of claimed error in refusing defendant's offer of demurrer.

Under the above presentation, this court assumed that, without objection, ratification had been considered by all parties as an issue of fact. Concluding as we did that an issue had been made for the jury and that we were bound by facts as found by the jury that were consistent with credible testimony, we, in the light of the facts above stated, did not, in our opinion, take up and make detailed discussion of the legal phases of the term "ratification."

Out of respect to that laudable insistency, that is characteristic of the legal profession and which leads to long judicial opinions, we yield in the spirit of him, who said, "Lead on McDuff . . ."

As we gather from Corpus Juris, volume 52, pages 1144 and 1145 and notations there found, we conclude, that "ratification implies assent to acts done by another that inure to the other's benefit. Accepting the benefit and assenting to the act constitutes such a meeting of minds as to fulfill the elements of a contract and thereby is binding upon the one receiving the benefit.

Having concluded that there was evidence that supported the findings of fact by the jury, we are bound by said findings of fact. Under the instructions the jury in order to find for the plaintiff had to find, as a matter of fact, that the injunction suit filed by defendant "was to delay and hinder the sale of bonds and the final consummation of the sale of plaintiff's real estate. Further, that said suit "was not filed in good faith." Further, "that an appeal was threatened for the purpose of harassing, annoying and vexing the plaintiff and of compelling the plaintiff to pay to defendant money to induce defendants to dismiss said bill in equity."

Being bound by the above finding of facts, we must conclude that defendants did no act in such relationship that can be concluded as done for plaintiff's benefit. That being so, there was nothing to ratify.

There is another phase, however, to the question of ratification. If, with all the facts in mind, all restraints removed, all elements of duress eliminated, the plaintiff herein of her own volition paid the money to defendant, then, such a condition existing, upon principles like unto ratification, the plaintiff would be barred from recovery. The question of voluntary payment is presented by the defendant under a separate head and we will proceed to that head for further consideration and comment.

Defendant's second suggestion is that, "money voluntarily paid out cannot be recovered."

The defendant bases its contention on the assertion that the money in controversy was voluntarily paid to it by the plaintiff. The defendant in support of its contention cites and quotes from Wilkins v. Look, 246 S. W. 1000, as follows:

"The rule is firmly established that courts will not permit a man to recover money back which he, with knowledge of the facts, has voluntarily paid out. Our Supreme Court, in the case of American Brewing Co. v. St. Louis, 187 Mo. 367, 1. c. 376, 86 S. W. 129, 131. (2 Ann. Cas. 821),' with reference to the question under discussion here, held that— 'The rule stated has been uniformly followed in this State with reference to all kind of payments, including taxes, licenses, and claims and the doctrine is firmly established that payments made with a full knowledge of all the facts constitute voluntary payments and cannot be recovered and that mistake or ignorance of law gives no right to recover.' [Walker v. St. Louis, 20 Mo. 143, 61 Am. Dec. 598; Claflin v. McDonough, 33 Mo. 412, 84 Am.˙ Dec. 54; Couch v. Kan. City, 127 Mo. 436, 30 S. W. 117; Teasdale v. Stoller, 133 Mo. 645, 34 S. W. 873, 54 Am. St. Rep. 703; Douglas v. Kan. City, 147 Mo. 1. c. 437, 48 S. W. 851.]"

To a consideration of the above well-stated fundamental principles, we must have the facts, as found by the jury in the case at bar, in mind to a consideration of the application of the same to the facts herein.

The jury has found that defendant's injunction suit was brought in bad faith and with a purpose of compelling payment of money from plaintiff to defendant. This court in its opinion handed down herein has declared the whole transaction culminating in the payment of the money to defendant as void from principles of public policy.

Under the conditions, found existing, plaintiff had been caused to make a deed to her property conveying same to Jackson County, which county was not a party to the agreement. This deed was caused to be deposited with the Kansas City Title & Trust Company as trustee.

The deed so deposited was pursuant to an agreement, which agreement provided that, "The said Title Company is hereby given *full* and *plenary* power to, as is instructed, to disburse the money or funds it may receive on account of each owner as the purchase price of his or her property." (Italics ours.)

The instruction for disbursement provided for the payment of three and one-half per cent of the purchase price to defendant. The agreement above was found by the jury to have been signed by reason of coercion on plaintiff that constituted duress.

The record shows that, as between the trustee and defendant, disbursement of three and one-half per cent of the proceeds from plaintiff's property was paid to the defendant.

The defendant now contends that the payment made to it by the trustee in exercising its "full and plenary power," was a voluntary payment on the part of plaintiff.

In support of its theory the defendant presents that the payment to it was under date of July 6, 1932, and that prior to said date to-wit, on May 24, 1932, its injunction suit had been finally disposed of and that it cannot be asserted that she was then under duress. The defendant in its brief says, "all possible duress was gone. She had the money in her pocket." By way of passing thought, the above language might imply that what "was gone" had former possible existence.

If the defendant in the above expression intends to say that the full price of her real estate was ever in plaintiff's pocket, then we conclude that the same is not borne out by the record. We conclude from the record that the money was paid into the hands of the trustee in the written agreement which this court has adjudicated as void and further, the three and one-half per cent of the purchase price of plaintiff's real estate was disbursed direct to defendant with no further delegation than that contained in said agreement. Herein lies a marked distinction between the case at bar and the case above quoted from.

To our mind, the question of ratification and of voluntary action goes to the act that put the control of plaintiff's property and the disbursement of the proceeds thereof beyond her control. We conclude that the payment made by the Title & Trust Company to the defendant cannot be imputed to plaintiff as her voluntary act nor as a ratification of any act done or suffered by defendant.

As to the money being paid over after the suit was dismissed, we conclude from the showing of the record that said suit was not dismissed and its coercive influences removed until it had worked the purpose of such impounding of the money in the hands of the title company as would and did assure its payment from the title company to the defendant.

The third suggestion made by the defendant is as to "admission of incompetent evidence."

The question raised in this motion for new trial is as to plaintiff's witnesses Neel and Huselton.

In the original brief the defendant made assignment as to these witnesses as follows:

"The trial court erred in admitting the following evidence:

"(a) Testimony of Mr. Neel (Rec., pp. 75, 76) and of Mr. Huselton (Rec., pp. 77-84) and of Mrs. White (Rec., pp. 136, 137) concerning statements and conversations by third persons, not in the presence of defendants; such statements being hearsay and not binding upon defendants."

The nature of the objection was not otherwise indicated than as above.

In accordance to our practice we turn to pages cited and review the evidence and note if objection was made and exception saved. No objection or exception was shown on the pages of the record cited.

In the motion for rehearing there are made citations to other pages of the record from which we conclude objections and exceptions were made and saved. While defendants' specification as found in its brief might justify a refusal to review, we are not moved by such a spirit.

As to the testimony of both Neel and Huselton, the same was concerning matters discussed in meetings pending negotiations that lead to the agreement that was afterwards signed, at which meetings the plaintiff was present. We conclude, that the testimony was competent as going to the question of plaintiff's state of mind.

Defendants' fourth suggestion is as to plaintiff's instruction number one.

Under defendants' assignment of error and the raising of the point in motion for new trial, this instruction is presented for review. In making a review we did so in the light of the testimony and in light of arguments presented and we conclude that the instruction was supported by and based upon competent evidence. The defendant's assignment of errors are set forth in full in our opinion heretofore handed down. As to defendant's assignment of errors number one, (b), (c) and (d), we conclude that all that is necessary to say was said in the opinion handed down, with but this addition, to-wit: . The mere statement of abstract propositions of law with citations following does not comply with the rule requiring that the brief distinctly allege errors committed by the trial court. [Automatic Sprinkler Co. of America v. Stephens, 267 S. W. 888, 306 Mo. 518; Bradbury v. Crites, 281 S. W. 725, 312 Mo. 694.]

The defendant's suggestion five is: "The evidence does not support the claim of duress." We conclude that we fully covered that subject in our opinion handed down.

The defendant's sixth suggestion is, to-wit, "public policy." As to this subject we discussed the same at length in our written opinion handed down. In addition to what was therein said, we will here quote the defendant's own language in dismissing its motion for a new trial in the injunction suit, to-wit: "Further, this plaintiff announces its intention irrevocably to not proceed further in the prosecution of this cause, and *in consideration of the public interest* and other considerations, receipt of which are hereby acknowledged, waive any right to appeal from any order issued herein and waive any right it has to sue out a writ of error in the above entitled cause." (Italics ours.) The defendant recognized that public interests were involved.

1052

Under suggestion number seven, exception to plaintiff's instruction number three is presented.

In the original brief claim of error was as to Instruction two. Instruction two was refused. We recognized that number three was intended and proceeded to discuss as to same.

We have given careful consideration to the opinion in the Keet-Roundtree Dry Goods Co. v. Hodges, 175 Mo. App. 484. The instruction therein tells the jury that they cannot find against an interpleader unless they find that the sale of goods was made in fraud. The instruction is declared error because it fails to define the term fraud as applied to the transaction involved. We conclude that said case is not in point herein.

The defendant makes citation of several like cases wherein the question involved is failure to define terms in instructions directing or permitting the jury to make findings of fact. The instruction in the case at bar but purports to define the term ''duress.'' We conclude that it was proper to give such instruction and also conclude that as a definition the instruction is not in error.

The defendant's eighth suggestion is, to-wit: ''Protection under the constitution.'' A wide field for Platonic reasoning and Didactic discussion is presented which if yielded to would lead to a thesis rather than a judicial opinion.

The defendant, in its assignment of errors, points and authorities, does not raise a constitutional question. However, even had it been raised we can, of course, only consider defendant's suggestion from the standpoint of application.

The defendant's Instruction H told the jury that defendant was within its legal rights in bringing its injunction suit.

Defendant's Instruction C-1 directs the jury as to its duty to determine all matters of fact from the evidence.

From a study of the record, and considering defendant's suggestion from the standpoint of application alone, we conclude there is nothing shown that would justify this court to hold that defendant has been deprived of protection under the Constitution.

We conclude duress may be manifested by exercising the rights, that the Constitution gives, in a wrongful way and for a wrongful purpose and that due process of law is susceptible of being used for an unlawful purpose.

Consideration of question of public interest involved has impelled to more lengthy discussion than probably the assignment of errors would require. As in all hotly contested suits the case at bar is not free from remarks and acts that it would have been better if not made or done. However, from a careful study of the whole record, we concluded that there was a fair trial and find no error of such prejudicial nature as presents reversible error.

The motion for rehearing is denied. All concur.