MARY ANN GARDINE, MARY ANN GARDINE, Guardian for LEROY IRVING GARDINE, RICHARD PAYTON GARDINE and KATHLEEN ANN GARDINE, Minors, Appellants, v. L. F. COTTEY and L. F. COTTEY, Executor L. F. COTTEY, Administrator Pendente Lite, WALTER A. HIGBEE, ERNEST M. GARDINE, MAUDE GARDINE and IVALEE ARCHIBALD, Respondents, No. 41427—230 S. W. (2d) 731.

Court en Banc, May 8, 1950.

Rehearing Denied, June 13, 1950.

682

*Roy Hamlin, H. Parker York* and *F. D. Wilkins* for appellants.

*Waldo Edwards* and *Jayne & Jayne* for respondents.

686

DALTON, J.—This appeal involves three somewhat factually related causes of action which were separately tried and disposed of, to wit: (1) an action to set aside, on the ground of fraud in its procurement, a property settlement contract between Mary Ann Gardine

and her then husband, LeRoy E. Gardine, and a subsequent conveyance of described real estate made pursuant to the contract, after a decree of divorce had been entered; (2) an action ▮▮▮ to contest the will of LeRoy E. Gardine, deceased, on the ground of testamentary incapacity, fraud and undue influence, in which action plaintiffs sought the appointment of a receiver and an injunction against the executor selling or disposing of the assets of the estate; and (3) an action to have a judgment for $100 per month for future support and maintenance of children, as contained in the Gardine divorce decree, allowed against the estate of LeRoy E. Gardine, deceased, for $19,200 to cover future payments until the youngest child should become 21 years of age.

The court denied the application for an injunction and the appointment of a receiver; found that the property settlement contract and the conveyance thereunder were not procured by fraud, but were valid and binding; directed a jury to return a verdict in favor of the will of LeRoy E. Gardine, deceased; and, on motion, struck out and dismissed plaintiffs' claim against the Gardine estate based on the judgment for support and maintenance. Plaintiffs have appealed.

## I.

The action to set aside the property settlement contract and the conveyance thereunder of Mrs. Gardine's one-half interest in the described 400 acre farm to LeRoy E. Gardine is based upon the charge that the contract and deed were procured by the fraud, misrepresentation and improper professional conduct, acts and omissions of L. F. Cottey, an attorney who represented Gardine, in telling Mrs. Gardine that he would represent both her and her husband in a proposed divorce action to be instituted by her against her husband, and in inducing her to permit him (Cottey) to represent her in said proceeding and to release, without any consideration whatsoever, all of her interest in the described real estate and her right to have alimony; and it is further charged that she signed the contract and deed ''not knowing at that time that the said L. F. Cottey was the agent, attorney and representative, looking after the interests of LeRoy E. Gardine, which were opposed to her interests.''

The action is brought by Mrs. Gardine in her own behalf and as guardian of her three minor children. These children are the only heirs at law of LeRoy E. Gardine, who died June 11, 1948, seized of the described real estate. The children are the beneficiaries of a trust fund (consisting of the major portion of the Gardine estate) set up in Gardine's will. By the action Mrs. Gardine seeks to establish her individual ownership of a one-half interest in the described real estate and to remove such real estate from the estate of her former husband. L. F. Cottey is sued ''in his individual capacity and

as an attorney'' and, also, as the duly qualified and acting executor of the will of LeRoy E. Gardine, deceased. After the filing of the action to contest Gardine's will, Cottey was appointed administrator pendente lite of the Gardine estate and he was then made a defendant in that capacity. W. A. Higbee, Circuit Judge and Cottey's father-in-law, is a party by reason of being named as trustee of the trust fund set up in the will for Gardine's children and by reason of being the record holder of existing and prior liens on the described real estate. The other parties named as defendants are beneficiaries under Gardine's will.

The alleged fraud, misrepresentation and unprofessional conduct occurred in September 1947. Gardine and his wife separated in October 1946. He had been in ill health for some years, but was engaged in raising turkeys and operating what is referred to as a turkey farm. As tenants by the entirety, the Gardines owned three farms, one referred to as the turkey farm (involved here) consisting of 400 acres, the Sloop farm 447 acres and the Gardine farm 56 acres. Each farm was mortgaged and Gardine's financial condition was far from satisfactory. He had expended large sums in an effort to regain his health and was heavily involved financially. There was evidence that Gardine owed ''the banks'' $20,000, that they were writing him and that the notes had been renewed and renewed. One note for $11,000 was secured only by his father-in-law's signature. Between October 1946 and September 1947, Gardine had furnished his wife less than $500 for the support of herself and three children. She had definitely made up her mind not to attempt to live with Gardine again, reconciliation was impossible and she intended to get a divorce.

Gardine was represented by L. F. Cottey, who had, on July 12, 1947, drawn Gardine's will, wherein Mrs. Gardine was excluded from benefits on the stated ground that she would be adequately provided for out of entirety property. Cottey had also assisted Gardine in changing the beneficiaries of some $38,000 of life insurance from Mrs. Gardine and the children to his estate. Mrs. Gardine had conferred with Charles Rendlen of Hannibal and was to furnish him the facts in the matter of obtaining a divorce. She testified that a few days after Mr. Rendlen had conferred with her in Lancaster, Cottey called her on the telephone and said he wished to see her on business. Within an hour she was at Cottey's office. She had not employed him as her attorney nor conferred with him before. She assumed that Cottey knew of Mr. Rendlen's visit, but she only told him that her father had suggested Mr. Rendlen to represent her. Cottey told her that he was representing Gardine; that Gardine had instructed him to consult her with reference to the terms of settlement of property rights, if she got a divorce; that, if a property settlement was made the terms would be harsh; that if she got a divorce without a contest it would be on Gardine's terms; and that Gardine

had announced the terms. Cottey then outlined the terms and they were discussed. Mrs. Gardine's testimony does not disclose whether she consented to or objected to the terms at the time they were submitted. Reconciliation was not discussed, but Mrs. Gardine told Cottey she would not live with her husband whether she got a divorce or not; and that she wanted a divorce. Cottey said Gardine wouldn't pay any attorney fee for the procuring of a divorce.

A few days later Mrs. Gardine came to Cottey's office at his request, a property settlement contract had been prepared and was submitted to her. The contract was dated September 20, 1947. It referred to the separation of the parties with no reasonable prospect of reconciliation and to the fact that she intended to sue for divorce and ask the custody of the three children. Gardine agreed that, if suit for divorce was instituted, he would waive the issuance and service of process and would enter his general appearance and waive his right to contest the suit. She agreed not to seek nor accept any judgment for alimony. He was to pay the cost of the suit and, in the event of a decree for plaintiff and the court should award custody of the children to her, the court should enter judgment for their support and maintenance in the sum of $100 per month, subject to future modification. If the decree was granted, she agreed to quit claim her right, title and interest in the farms hereinbefore referred to. Gardine agreed to refinance the loans on the farms and to hold her harmless on the notes pending refinancing. The agreement further provided for a mutual release of claims between the parties and that a certificate of title to a DeSoto sedan be assigned to Gardine. She read the contract over and knew what it was when she read it. The contract was then signed and she received and retained a copy of it. At the time she signed the contract she knew that she and Gardine ''jointly owned the land''; and that, under the property settlement she was signing, she was to make Gardine a deed after the divorce. She also knew they were jointly obligated on about $17,000 of notes. The Des Moines bank note on which her father was security for Gardine was discussed, but she was not on that note. Cottey made no misrepresentations to her and, after the deeds were made, the loan on the turkey farm was refinanced and she was ''taken off the notes.''

Mrs. Gardine further testified that Cottey told her that he would represent both her and her husband in the divorce case; that it would be unnecessary to get Mr. Rendlen, as he (Cottey) would handle the case and it would cost her nothing; that she told her father Gardine would pay the expense of the divorce, including Cottey's fee; that when she read the contract in Cottey's office, they did not discuss it; that ▬▬ Cottey advised her to sign it, saying it was best for her own interests; that Cottey advised her to assign the car title to Gardine and she relied upon him; that she did not know

of her rights in the real estate or that it was jointly owned by husband and wife; that her rights were not discussed; that Cottey was acting as her attorney and she signed the contract because he advised her to sign it; that neither before nor after the divorce did she receive any money or property or anything of value for her interest in the real estate or personal property released.

Two days after the contract was signed, Mrs. Gardine again went to Cottey's office at his request. She there signed and swore to the petition for divorce and then went to the Court House for the hearing. The petition for divorce was based upon general indignities. Gardine signed and filed a waiver of service. Cottey presented plaintiff's evidence in the divorce hearing. There was no contest. Mrs. Gardine, her father and her witnesses were present. The decree of divorce was for Mrs. Gardine with an award of the custody of the three children and $100 per month for support and maintenance. The decree further stated that ''the plaintiff and defendant have fairly agreed upon a property settlement between themselves, contingent upon the granting of a decree of divorce to plaintiff herein, wherein adequate provision has been made for plaintiff in lieu of, and in satisfaction and settlement of any claim which plaintiff might otherwise have against defendant for alimony.'' The property settlement was ''approved and confirmed in lieu of any award of alimony.'' Plaintiff received and retained a copy of the decree.

On the day the decree of divorce was granted, Mr. and Mrs. Gardine joined in a conveyance of the Sloop farm to Mrs. Gardine's father for $20,000. Her father assumed certain mortgage liens against the farm, paid off Gardine's $11,000 note to the Des Moines bank and paid a difference of $583.01 to Gardine.

On the day after the divorce, Mrs. Gardine again appeared at Cottey's office at his request and signed the deed here in controversy to the turkey farm. She knew that she was signing a deed to the turkey farm. She also knew what she was doing when she signed the deed to the Sloop farm. Although both farms were in the property settlement, she only seeks to set aside the deed to the turkey farm and said the property settlement didn't have anything to do with the Sloop farm, since she and Gardine executed a deed for this farm to her father on the day of the divorce and before the divorce suit was filed.

With reference to her charge of fraud against Cottey, she said ''it isn't what he did. It is what he didn't do. He didn't explain or advise me * * * I trusted him. I didn't think he would take advantage of a client.'' She further said that Cottey had had her husband change his insurance from his children to his estate; that Cottey didn't tell her what she could have done; that she should have had some property rights; that she thought the contract was fair and square; and that her charge of fraud was based on Cottey's failure

to tell her of her property rights. She further said that the mis-representations took place before the farms were "sold"; that Cottey didn't tell her that Gardine had changed $38,000 of insurance from his children to his estate; that he didn't tell her he had written a will for Gardine leaving her out; and that Gardine's will and the insurance matter were not discussed.

After the decree of divorce was granted Gardine paid the $100 per month for the support of the children until his death. Mrs. Gardine admitted that she had taken no steps to set aside the contract and deed until after her husband's death (June 11, 1948) and until after the judgment for support and maintenance was refused allowance against Gardine's estate on August 9, 1948. She said she didn't know of the change of insurance beneficiaries until January 1948 or that Cottey was to be executor until after Gardine's death.

The evidence does not show Gardine's net worth in September 1947, but in June 1948 the turkey farm was appraised at $25,000 and it was then encumbered by a deed of trust securing a note for $13,000. Gardine's personal property was appraised at $37,742.54. Certain personal property in his estate was sold prior to the hearing of this cause and the administrator pendente lite had $21,433.50 in cash on hand at that time. Claims for $26,500 had been filed.

For defendants, L. F. Cottey testified that in September 1947 he represented Gardine and, after several conferences with his client about a threatened divorce suit, he phoned Mrs. Gardine to come to his office, where he told her that he represented Gardine; that, if a divorce action was filed, Gardine would contest it; that such a suit would be a hard one for plaintiff to win, since the suit would largely be based upon conversations between husband and wife, which would be inadmissible if no one else were present; and that "it would be a public airing of the whole thing * * * a knock-down and drag-out." She told him "she did not want that." He told her that a settlement might be arranged between herself and Gardine and between Gardine and Mr. Miller (Mrs. Gardine's father). He then told her the terms upon which Gardine would permit a divorce without a contest. The terms were discussed. The property settlement contract was later discussed with Mr. Miller and a settlement was arranged between Miller and Gardine. Mrs. Gardine then came to Cottey's office and signed three copies of the property settlement contract between herself and her husband and she received one copy. At that time the contract was not discussed, but she read it before she signed it. The two contracts between Gardine and Miller (one for mutual settlement of claims and one for the purchase of Sloop farm) were dated and signed on the same day.

The matter of who should represent Mrs. Gardine in the divorce case was not discussed until after the property settlement contract between the Gardines and the Miller-Gardine settlement and sale

contracts had been signed and the matter of fees for an attorney to obtain the divorce decree (for which fees Gardine was obligated) was in controversy. Mr. Miller suggested that Cottey handle the case. Cottey then obtained the consent of Gardine and on Monday, September 22, 1947, Mr. Miller brought Mrs. Gardine to Cottey's office to have the divorce matter disposed of. Cottey then, for the first time, discussed with Mrs. Gardine the matter of representing her in handling the divorce case. It was agreeable to all the parties that he prepare the divorce petition and present the evidence to the court, as was done. He also prepared and filed an entry of appearance for Gardine and drew the form for the decree of divorce. No charge was made against Mrs. Gardine or paid by her. Cottey said "there was no conflict (of interests) after the agreement was reached." He denied that he told Mrs. Gardine it was to her best interest to sign the settlement contract or that it was unnecessary for her to have an attorney. He told her that the property settlement contract would "eliminate her rights"; and that if she wanted a contest to go ahead. He did not ask to represent her and did not get the facts necessary to the drafting of a petition for divorce until the day the petition was filed.

Cottey further testified that, when he conferred with Mrs. Gardine, he knew Gardine could not live very many years. He knew Mrs. Gardine was the injured party in the divorce matter and would testify to facts supporting her petition for divorce as the innocent and injured party. He did not mention Gardine's will to her, nor the fact that Gardine had changed the beneficiary of his life insurance. He did not advise her as to her rights in the real estate owned by husband and wife as tenants by the entirety. He told her that her father would object to the property settlement, but if she wanted "a divorce without a contest that is the way you will have to get it." Nothing was said about her lawyer, although he had learned from his client that Mrs. Gardine's father had consulted Rendlen. In advance of the divorce proceeding Judge Higbee (apparently on behalf of the bank holding the note) had agreed with Cottey that, if Mrs. Gardine after her divorce conveyed her interest in the land to Gardine, a new loan would be made and she would be released from ▮▮▮ liability on the old notes. She was released on some $17,000 worth of paper secured by real estate worth in excess of $40,000.

In rebuttal, Mr. Miller denied any connection with the property settlement between his daughter and Gardine and he denied that he was present in Cottey's office with Mrs. Gardine. The evidence took a wide range in the examination and cross-examination of all witnesses.

The court found that "the plaintiff knew that Cottey was representing her husband and was expressly advised by him that any settlement

.of property rights had to be on the husband's terms—harsh though they might be. To these terms the plaintiff acceded in order to get an uncontested divorce without expense to her, Cottey misrepresented nothing to her, used no duress and in my opinion under the facts and circumstances was obliged to disclose to her nothing more than he did, * * * under the evidence the Court is bound to find the issues in favor of the defendants * * *.''

This action is in equity and we try the cause de novo. Bullock v. E. B. Gee Land Co., 347 Mo. 721, 148 S. W. (2d) 565.

After the divorce decree was entered, Mrs. Gardine, in conformity to the contract, deeded the farm in question to her former husband. In this proceeding she seeks to cancel that deed, establish her interest in the property conveyed and obtain an accounting for rents and profits and other relief. Her theory is that L. F. Cottey was her attorney and acted in a fiduciary capacity and advised her to sign the contract and deed when in fact Cottey represented her husband, whose interests were in direct conflict with hers; that the property settlement, the divorce decree and the conveyance deprived her ''of all her property and rights in law''; and that the action and conduct of Cottey constituted a fraud upon her entitling her to affirmative relief in a court of equity. Appellants urge that Cottey did not disclose to her her property rights in the described real estate, or advise her that he had drawn a will for her husband and had assisted in changing the beneficiary of his life insurance from her and the children to the executor of his estate.

The trial court heard the oral testimony of the several witnesses and found the issues in this case for the defendants. There is nothing in this record to justify this court in overthrowing any fact issue determined by the trial court upon the conflicting oral testimony of these witnesses. Mrs. Gardine's testimony is not clear, cogent or convincing, but in a number of instances is evasive, contradictory and otherwise unsatisfactory. On all issues involving the credibility, weight and value of the oral testimony, we must and do defer to the trial court, but it does not follow that the decree should be affirmed.

■ The property settlement contract was before the court. It contained an agreement for an uncontested divorce, if Mrs. Gardine should institute the action. The trial court so construed the agreement. Respondents' evidence shows that an uncontested divorce was bargained for. We hold that the contract was illegal, void and against public policy. Beardsley v. Bass, 287 Mo. 393, 229 S. W. 1092, 1093; Bishop v. Bishop, (Mo. App.), 162 S. W. (2d) 332, 335; Crooks v. Crooks (Mo. App.), 197 S. W. (2d) 686, 688.

■ Respondents, however, contend that ''the validity of the transaction'' was adjudicated in the divorce action and is now

res adjudicata, as pleaded in the answer. There is no merit in this last contention since the validity of the contract and the subsequent deed were not pleaded or in issue in the divorce case. The issue there was plaintiff's right to a divorce. The petition contained no prayer for alimony and none was granted. When the divorce was granted, plaintiff ceased to be seized of the whole property as a tenant by the entirety and became seized of an undivided one-half interest as a tenant in common with her former husband. Jones v. Jones, 325 Mo. 1037, 30 S. W. (2d) 49, 55.

On the charge of fraud and unprofessional conduct in the procuring of the illegal contract and the conveyance thereunder, Cottey's position, as stated, was that there was no conflict of interest between Gardine and Mrs. Gardine after the property settlement contract was signed. We cannot agree. The contract was void and unenforceable and the rights of the parties were not changed by its execution. Cottey represented Gardine. He knew of the execution of the will and its terms under which Mrs. Gardine was excluded from the benefits and under which Gardine's property would, in all probability, come under his (Cottey's) control as executor and, later, of his father-in-law as testamentary trustee with broad discretionary powers. He knew that Mrs. Gardine was no longer the named beneficiary of $38,000 of Gardine's life insurance. As an attorney, he knew of her rights in the real estate owned as tenants by the entirety (the right of survivorship in event of Gardine's death and the right to a one-half interest in case of divorce). He knew of her right to alimony, if she was the innocent and injured party. He drew the property settlement contract and knew that it was collusive, void and unenforceable and that the rights of the parties would not be affected thereby, unless it were carried into execution by a divorce and a subsequent conveyance. It was important therefore that the contract be consummated, but Cottey was in no position to advise Mrs. Gardine on any of these matters.

Cottey further knew that Gardine was a sick man; that he could live but a few years; and that, in the event of a divorce being granted, Mrs. Gardine could not renounce the will. He admits that she was the injured party and that upon her statement and testimony, she was the innocent and injured party. She was the mother of three small children and under the property settlement contract, the will, the change of insurance, the decree of divorce and the conveyance she would receive nothing for herself. Regardless of these facts Cottey agreed to represent her in the divorce action. He drafted the petition, prepared and obtained the entry of appearance of Gardine and presented her evidence. He drafted the form for the decree of divorce and recited the erroneous statement that adequate provision had been made for plaintiff in lieu of alimony. He prepared the quit claim deed to the farm in question, obtained Mrs. Gardine's

signature thereto and represented her in carrying into effect the void contract.

When Cottey consented to represent Mrs. Gardine in the divorce action, he became her attorney and a fiduciary with the duty to represent, advise and protect her interest, which he could not do in view of his position as Gardine's attorney. On the admitted facts he was bound to know that Mrs. Gardine's interests directly conflicted with those of his client Gardine; and that her interests were not being served. In representing her in consummating the illegal contract, releasing her claim to alimony and subsequently conveying her interest in the property to Gardine under the illegal contract, Cottey was perpetrating a fraud upon her. The fraud was consummated, not by the execution of illegal contract, but by Cottey's action in acting as her attorney in the institution and consummation of the divorce action and in the execution and delivery of the conveyance under the contract. Cottey knew that she was acting without the advice of or assistance of a disinterested counsel who was free to represent and advise her.

"The very nature of a lawyer's profession necessitates the utmost good faith towards his client and the highest loyalty and devotion to his client's interest." In re Thomasson's Estate, 346 Mo. 911, 144 S. W. (2d) 79. "The relation between attorney and client is highly fiduciary and of very delicate, exacting and confidential character, requiring very high degree of fidelity and good faith on attorney's part." Laughlin v. Boatmen's Nat. Bank of St. Louis, (Mo. Sup.), 163 S. W. (2d) 761; Bybee v. S'Renco, 316 Mo. 517, 291 S. W. 459, 461. A breach of fidelity to a client's interest constitutes constructive fraud. Fiske v. Buder, 125 F. (2d) 841; In re Conrad, 340 Mo. 582, 105 S. W. (2d) 1, 10.

It is immaterial that both Gardine and his wife consented for Cottey to represent her in the divorce case and in carrying out the illegal contract which disposed of her property and marital rights. There ▮ was no disclosure to her of the facts showing a conflict of interest. Nor was there any disclosure of facts showing Cottey's own interest or that of his father-in-law. See, Supreme Court Rule 4.06 and Merz v. Tower Grove Bank & Trust Co., 344 Mo. 1150, 130 S. W. (2d) 611, 621. On his own testimony, Cottey could not properly represent Mrs. Gardine in the divorce action or in making the conveyance under the contract.

▮ Are appellants entitled to the relief sought? In this action no one is seeking to enforce the property settlement contract. The petition alleges and the proof shows that the terms of the contract have been carried into effect and respondents insist that Mrs. Gardine may not benefit by the contract's invalidity. "The general rule is that neither party to an (illegal) agreement that has been executed on both sides will be aided in recovering what has been parted with

under the agreement.'' 12 Am. Jur., Contracts, Sec. 213, p. 724; Idel v. Hamilton-Brown Shoe Co., 343 Mo. 373, 121 S. W. (2d) 817, 821; 17 C. J. S. 656, Contracts, Sec. 272.

The right to relief in part turns on whether Mrs. Gardine and her then husband were in pari delicto with reference to the illegal contract. In our opinion, she was not. The entire matter on Gardine's behalf was handled by Cottey and Cottey's action and conduct with reference to obtaining the contract were Gardine's action and conduct. Mrs. Gardine was an educated woman, some thirty years of age, a graduate of the Lancaster High School and of Stephens College, Columbia, with some stenographic experience in her husband's office in Des Moines, Iowa, and in her father's business at Lancaster, Missouri. On the other hand, Cottey was a graduate of the Law School of the University of Missouri and was admitted to the bar in 1931. During the recent war he had been a Lieutenant Colonel in the military service of his country. He had resumed the general practice of the law at Lancaster. On the facts shown Cottey and Mrs. Gardine did not stand on an equal footing with reference to the proposed contract. He was skilled in the law and she was not. He prepared and submitted the contract for her signature. While Mrs. Gardine was a party to the contract she was not in pari delicto with her husband. Green v. Corrigan, 87 Mo. 359, 370; Poston v. Balch, 69 Mo. 115, 121; White v. McCoy Land Co., 229 Mo. App. 1019, 87 S. W. (2d) 672. The admitted facts show that she was imposed upon and overreached.

The cause here involves a matter of great public interest, to wit, the conduct of the licensed attorney at law who undertook to represent both Gardine and his wife at the same time. Sound public policy requires that an attorney not represent conflicting interests.

''In matters of public policy our courts are confronted with a duty that is paramount to the pecuniary interests of litigants and it is our duty * * * to heed that higher duty.'' White v. McCoy Land Co., supra (87 S. W. (2d) 672, 685). Where sound public policy will be better promoted by granting than by denying relief in a case such as this, an exception to the general rule applies and relief will be afforded a party to an illegal contract to recover the property transferred thereunder, particularly so, where the parties are not in pari delicto. Lindsley v. Caldwell, 234 Mo. 498, 505, 137 S. W. 983, 984; Witmer v. Nichols, 320 Mo. 665, 671, 8 S. W. (2d) 63; Hobbs v. Boatright, 195 Mo. 693, 715, 93 S. W. 934; Merz v. Tower Grove Bank & Trust Co., supra (130 S. W. (2d) 611, 622); 17 C. J. S. 660, Contracts, Sec. 274; 12 Am. Jur. 729, Contracts, Sec. 214. On the admitted facts shown by this record, the exception should be applied.

The judgment on this count (II) is reversed, the conveyance in question is set aside subject to the lien of the $13,000 deed of trust,

and the cause remanded for an accounting of rents and profits and other relief. It is so ordered.

## II.

After the action in equity had been tried and disposed of, the case went on change of venue to the Circuit Court of Macon County where the will contest was tried to a jury and, as stated, the court ▆ directed a verdict in favor of the will. The petition (count I) charged testamentary incapacity and that testator's signature to the purported will was obtained by "over-persuasion, duress, fraud, deceit and undue influence exerted on him by parties to this plaintiff unknown * * * in an effort to defraud plaintiff in her marital rights" and testator's three children of their rights and inheritance from their father. In view of plaintiffs' theory that there was a general scheme and plan to defraud testator and the members of his family and to get possession and control of his estate, the evidence took a wide range and the record is voluminous.

▆ The alleged will was presented for probate by L. F. Cottey, an attorney, on June 12, 1948, the day after Gardine's death. It was admitted to probate in common form by the probate court of Schuyler County on the 16th day of June, 1948, upon affidavits (sufficient in form and substance) of Ruth Vaughn and P. L. Sparks, the attesting witnesses. L. F. Cottey qualified as executor and the administration of the estate continued until this action was instituted on August 13, 1948.

The alleged execution took place between 10 and 11 a. m., exact time not shown, July 12, 1947, in a room in the Grim-Smith Memorial Hospital in Kirksville, where Gardine was a patient. P. L. Sparks, business manager of the hospital and a notary public, testified that, on July 12, a nurse asked him to come to Gardine's room to witness a will. Sparks contacted the superintendent of the hospital and obtained his consent and approval to go in Gardine's room for that purpose. In the room, he found L. F. Cottey, Gardine and Miss Vaughn, superintendent of nurses. Gardine was sick in bed, Cottey was standing. Cottey said he wanted them to be witnesses to Gardine's will. Gardine said that would be satisfactory; that the document was his will; that he had read it and "knew what was in it." "He raised up on his elbow like and signed on the bedside table." All were present in the room when Gardine affixed his signature to the instrument exhibited, then Miss Vaughn and Sparks signed as attesting witnesses. Sparks' fountain pen was used and Sparks and Miss Vaughn also placed their signatures on the first page of the will, at Cottey's request, so that there would be no question that it was a part of the will. Gardine was then 32 years of age. Sparks had known him since 1946 and he observed him when he signed the will. Gardine was of sound mind and knew what he was doing.

Miss Vaughn's testimony was to the same effect. On the same date and before the will was executed, Gardine signed some papers for a change of beneficiary of insurance and Sparks took his acknowledgment, but the papers "did not go through" and some others were executed a few days later.

The attesting witnesses were cross-examined concerning their testimony in prior depositions and the depositions were offered in evidence. In his deposition Sparks could not remember whether Gardine had signed in his presence or only acknowledged his signature. He thought he, himself, had signed only once at the bottom of the page. He had refreshed his recollection on the day of trial when he saw the will and he had talked to Miss Vaughn and to Mr. Jayne and Mr. Cottey about the case.

In her deposition Miss Vaughn had testified that Mr. Cottey asked her if she would witness Mr. Gardine's will; that she heard Gardine make no statement whatever but, when she got ready to leave, Gardine thanked her. She thought she signed only once. In explanation, she said that she had talked to Mr. Cottey and Mr. Jayne and now recollected that she saw Mr. Gardine sign the will. The will was admitted in evidence over contestants' objection that it had not been established according to law.

Appellants contend that proponents failed to make a prima facie case; that the testimony of the subscribing witnesses was contradictory and conflicting raising an issue of fact as to the due and proper execution of the will and requiring the submission of their testimony to a jury. The alleged will was in due form with the usual attestation clause. The signature of testator and the several signatures of the attesting witnesses were in nowise questioned. The affidavits of the witnesses, dated June 15, 1948, showing the due and formal execution of the will, were in evidence. The subsequent depositions had been taken without the alleged will being exhibited to the witnesses. Considered as a whole, the deposition testimony confirmed the testimony of these witnesses that they had signed as attesting witnesses and such testimony was not destructive of their testimony at the trial. Reeves v. Thompson, 357 Mo. 847, 211 S. W. (2d) 23, 27. Nor do we find such a conflict between the deposition testimony and the testimony at the trial as would require a submission of the weight and value of such testimony to a jury. See, 57 Am. Jur. 611, Wills, Sec. 928; 68 C. J. 1073, Sec. 895. Proponents made a prima facie case on the issue of testamentary capacity and the formal signing and witnessing of the will. Look v. French, 346 Mo. 972, 144 S. W. (2d) 128, 133; Heinbach v. Heinbach, 274 Mo. 301, 202 S. W. 1123, 1128; German Evangelical Bethel Church of Concordia v. Reith, 327 Mo. 1098, 39 S. W. (2d) 1057, 1064; Carlson v. Lafgram, 250 Mo. 527, 535, 157 S. W. 555. The court did not err in directing a verdict for the will on the issue of its formal execution.

Morrow v. Board of Trustees of Park College, 353 Mo. 21, 181 S. W. (2d) 945, 951.

The will provided (1) for the payment of debts; (2) authorized the executor to waive the technical rules and requirements of evidence in the matter of establishing of claims against the estate; (3) confirmed an authorization changing the beneficiary in $38,680 of life insurance and requesting payment to his executor in a lump sum; (4) provided a $500 legacy for testator's mother and father, jointly, and a $500 legacy for his sister; (5) provided nothing for his wife from his estate, since she would be adequately provided for out of entirety property; (6) created a trust fund for testator's three children by providing that his executor reduce his estate to cash and pay over the residue to W. A. Higbee, as trustee, to be used, held and invested by him for the use and benefit of said children "in such manner as he, in his sound judgment, may deem to be for their best interest and welfare" and for their "health and proper education" and providing for the equal distribution of any funds remaining when the youngest child became 21 years of age; and (7) appointed L. F. Cottey as executor and authorized him to sell and convert to cash any property * * * (of the estate) * * * upon such terms as he may deem best, without first obtaining any order of the probate court to do so." Neither Judge Higbee nor Cottey were related to Gardine or his wife by blood or marriage. Judge Higbee had been consulted by Cottey and had consented to act as trustee before the will was executed.

None of the record in the equity suit, supra, was offered in evidence in the trial of this cause. The Gardines were married in 1936. Gardine was subsequently employed by K. I. Miller (Mrs. Gardine's father) in the chicken hatchery business at Lancaster and at the Des Moines, Iowa branch. In later years he suffered severely from spondylitis, arthritis in the spine and one hip, and he was treated for this condition at Mayo's Clinic and other places. His condition gradually grew worse. He also suffered from cirrhosis of the liver and, as early as 1946, he suffered hemorrhages from the intestinal tract, indicating that the liver condition was well developed and the patient was in a serious condition. He returned to Lancaster in May 1946 and engaged extensively in the turkey raising business and was so engaged in June 1948 at the time of his death.

In October 1946, Gardine separated from his wife and went to live at a hotel, then with his parents and later in an apartment. His wife and three children (ages now 10, 9, and 5) continued to reside on her father's farm. Gardine was very fond and affectionate toward his children at all times. Mrs. Gardine, from time to time, took the children to see their father. Although, he had separated from her and she never expected to live with him, she saw him in his apartment every day or so, or several times a day. Gardine wanted to live with

her and she didn't definitely make up her mind to divorce him, until ▉ after she saw Cottey in September 1947. On July 3, 1947, when she went to see him, she found that he had gone to the Grim-Smith Memorial Hospital at Kirksville. She went there immediately, but Miss Vaughn, superintendent of nurses, told her not to go in his room and she returned home. She went back to Kirksville "almost every day," "several trips," to try to see him, but "they just wouldn't let" her in; and she didn't get to see him until July 12, 1947.

Mrs. Gardine and her father arrived at the hospital at about 11 a. m., July 12, 1947. They went to Gardine's room and there wasn't anybody there with him. They went in and saw him lying on the bed. He appeared to be asleep, his eyes were closed. She undertook to awaken him but did not succeed. She "walked over and leaned down and kissed him and took hold of his hand and said 'LeRoy, this is Mary Ann and Dad is here.' " Gardine opened his eyes, and looked at her, but didn't say anything. She said "LeRoy, is there anything I can do," and still he didn't say anything. Her father said: "LeRoy, this is 'Kinny,' " but still Gardine didn't say anything, just moaned. She testified that apparently Gardine didn't recognize her. It was her judgment that he was "just in a stupor, a coma," she "would say." She and her father were in the hospital about five minutes and then left. Her testimony, as to her visit and Gardine's condition, was confirmed by her father's testimony. Neither Mrs. Gardine nor her father inquired of any nurse or doctor or other person concerning Gardine's condition, they didn't stop at the office and they had no recollection of seeing or talking to anyone they knew, on this trip from Lancaster to Gardine's room and return. Gardine was discharged from the hospital August 1st.

Dr. C. E. Grim, a physician and surgeon, who was actively engaged in the practice of his profession in the Grim-Smith Memorial Hospital, testified that when Gardine was admitted on July 3, 1947, he was hemorrhaging, was drowsy and chilly. He was given a one-fourth grain of morphine sulfate to keep him quiet and to quiet down the movement of his intestines; glucose and Red Cross plasma to build up blood volume; and vitamin K to alleviate and stop hemorrhages. At first morphine was given four times per day, later (8th to 11th) three times per day and on the 12th, only twice (2:10 a. m. and 8:00 p. m.). The doses were not excessive. After morphine is given for awhile the system tolerates it without effect. The maximum effect is seldom over four hours and, since Gardine had had morphine over a period of time, the effect was probably not so long. The amount given would not make Gardine stupid or groggy or put him sound asleep, but would relieve pain and make him rest and give some relief. On the evening of the 11th Gardine was nauseated and vomiting and extremely restless and uncomfortable. The nausea did not seem to bother him a great deal. He could be nauseated and vomiting and

turn over and rest. Morphine was given at 2:10 a. m., but he continued to be nauseated, very restless and did not sleep during the night. This was a part of the general picture on account of the disease and Gardine's nervous make-up. He was anxious about himself at times. The hospital records showed that he was never asleep during the night. On the 12th he had grape juice at 9 a. m., lemon juice at 1 p. m., and oatmeal, tea and toast that evening. He ate all he asked for. Diet restrictions were removed the 13th. While in the hospital he went to the bathroom on his own power, whenever he was not too weak from hemorrhages, but apparently he was not up the first two weeks. Dr. Grim thought that Mr. Sparks consulted him about Gardine's condition on July 12th and he thought that he went to Gardine's room on that date, but he could not be sure, nor recall the details of the conversation.

Mrs. Gardine testified that, when she saw Mr. Cottey in September, 1947 on her first trip to his office, Cottey said he wanted to talk to her about getting a divorce from Gardine. He did not tell her that he represented Gardine. She and her father had tentatively employed Rendlen in the divorce matter. Cottey didn't think it necessary to get Rendlen, or anybody outside. He said he would be glad to be her lawyer, take care of her and her husband and there would be no charge. He did not know what Gardine wanted. The matter of property rights and a property settlement were not discussed, only the matter of divorce and the grounds for divorce. There was no agreement on the matter of divorce. She didn't know when she gave Cottey the facts for the divorce petition. She told Cottey that it didn't make any difference whether she got a divorce or not. Alimony was not discussed, but she didn't want any alimony. Two days later Cottey called her back to the office and presented the property settlement contract for her signature. It was already drawn up and she didn't read the contract and Cottey did not read it to her. She signed in reliance on her attorney's judgment. She did not know what her rights were in property held by the entirety. She didn't think about it or know the land would be hers, if Gardine died. She didn't know "the insurance had been changed," and Cottey didn't tell her. She thought the children would get the proceeds of Gardine's insurance. When she and Gardine were married, neither owned any real estate, but at the time she saw Cottey, she and her husband owned three farms jointly (400 acres, 447 acres, and 56 acres), and two had been purchased from and were mortgaged to Judge Higbee. She now had only a house and lot in Lancaster that rented for $10 per month. Her husband was never present when she conferred with Cottey. When she was next called by Cottey, there were more papers to sign, including the petition for divorce and the title certificate to the automobile Gardine used. She knew the divorce suit was not to be contested. In the divorce

hearing she was asked if a property settlement had been made and was satisfactory and she told Judge Higbee that it was. Cottey called her back the day after the divorce was granted to sign additional papers and deeds, she did not know what or who to. She didn't remember signing the quit claim deed to the turkey farm.

On cross-examination, when confronted with her prior testimony, she then testified in substantial conformity to her testimony in the equity case. She admitted that, on the first day she saw Mr. Cottey, he told her of the demands her husband was making upon her by way of a property settlement, and she told Cottey she would accept the terms. She further testified that Gardine drank intoxicating liquor to excess, ''almost constantly,'' and that he sometimes drank 2/5 per day. After his return to Lancaster in 1946 and, prior to separating from his wife, ''he drank even more heavily than he had ever done in his life.'' At times she would be unable to take care of him and would have to put him in a sanatarium to have him cared for. He steadily got worse and he was drunk July 2, 1947, the day before he entered the hospital.

On June 16, 1948, Gardine's personal property was appraised at $37,742.54 and the turkey farm at $25,000. On August 13, 1948, when Cottey was appointed administrator pendente lite of the Gardine estate, there was $21,668.76 cash in the estate, but $10,799.54 was subsequently disbursed between August 13th and November 30, 1948. The turkey farm had not been sold. On June 22, 1947, Judge Higbee, Circuit Judge and President of the Schuyler County Bank, presented and filed in the Probate Court of said county a claim of the bank against the Gardine estate for $14,361.43, based on Gardine's notes. Judge Higbee's son-in-law, L. F. Cottey, who was executor of the Gardine estate and also a stockholder, director and an attorney for the bank appeared on behalf of Gardine's estate and a jury was waived, the cause submitted to the court, evidence heard and the claim allowed.

On July 12, 1947 (when Gardine attempted to change the beneficiaries of his insurance policies from his wife, as primary beneficiary, and his children as contingent beneficiaries to the executor or administrator of his estate) Gardine's debts exceeded $60,000, including $10,000 against the turkey farm, $8,200 against the Sloop farm, $11,000 to a Des Moines bank and an unliquidated claim of approximately $15,000 to Miller. This last claim was subsequently cancelled in the contract of mutual settlement of claims between Gardine and Miller on September 20, 1947. When Miller was attempting to buy the Sloop farm and to pay off the Des Moines bank note as part of the purchase price, Gardine refused, but Miller consulted Cottey and Cottey said: ''He'll sell it if I tell him to. He has got to do what I tell him.'' The sale was then consummated September 20, 1947.

As indicated, supra, on July 12, 1947, when the will was executed, Gardine had $38,680.00 of life insurance, $2,000 payable to his parents and $36,680 payable to his wife as primary beneficiary. On that date Gardine executed a paper directing the insurance company to change the beneficiary of $36,680.00 of life insurance from his wife, as primary beneficiary, to the executor or administrator of his estate. The form authorizing the change was not satisfactory to the company and other forms were subsequently executed.

In December 1947, Gardine was in St. Luke's Hospital in Kansas City and conferred with representatives of the Insurance Company about an insurance loan. Immediately after this conference, the beneficiary of some $33,680 of life insurance was changed from his estate to his three children, and three policies, including those still payable to his estate, were pledged as security for a $7,000 bank loan. Apparently, Cottey did not know of the change from the estate to the children, since he called the Insurance Company on June 15, 1948, and asked for papers to make a claim on behalf of the estate for the proceeds of the policies. He was advised that only $5,000 was payable to the estate, $33,680 having been changed to "direct beneficiaries." It will not be necessary to review other facts shown by this record.

██ Error is assigned on the exclusion of the proferred testimony of three medical experts concerning testator's mental condition at the time the alleged will was executed. These witnesses had not observed, treated or examined the testator in his lifetime. Hypothetical questions were submitted in different forms purporting to state what counsel considered to be a favorable view of the facts shown by contestants' evidence. On such statement, the witness was asked whether or not in his opinion "this man was mentally competent to transact any business or execute a will disposing of his estate." Objections were made and sustained and contestants offered to show that the answers would be that "the subject of inquiry was incompetent to transact business at the time it is purported he signed the will." One offer of proof included the words "and he was not a person of sound mind," but no witness was questioned on such issue. Appellants contend the questions were correct and proper and included all facts essential to contestants' theory and that the answers called for by the questions, and the testimony offered, was competent.

We think the questions were objectionable as submitting numerous conclusions with the facts, as submitting facts not shown by the record and as calling for conclusions of law. An expert witness may not be called upon for a conclusion of law. Fields v. Luck (Mo. Sup.), 44 S. W. (2d) 18, 21; State v. Cochran, 356 Mo. 778, 203 S. W. (2d) 707, 713(12). Also see Baptiste v. Boatmen's Nat. Bank of St. Louis (Mo. Sup.), 148 S. W. (2d) 743. Further, the facts submitted by the question (as hereinafter discussed) were not inconsistent with

704

sanity. Nute v. Fry, 341 Mo. 1138, 111 S. W. (2d) 84, 87. The court did not err in sustaining the objections to the several questions and' excluding the testimony offered.

■■ Appellants further assign error on the court's action in directing a verdict in favor of the will on the issues of testamentary incapacity, fraud and undue influence, as raised by contestants. On the issue of testamentary incapacity, appellants point to the diseases suffered by Gardine, to his physical condition, sleeplessness and nausea, to the drugs given and other treatments administered, to his prior use of intoxicating liquors, to the changing of his insurance in view of his financial condition ($60,000 indebtedness and some $83,000 of assets), to the alleged ''harsh and unusual'' provisions of his will, to the exclusion of the wife from benefits, to the wide discretion granted to the named executor and testamentary trustee and to the circumstances testified to by Mrs. Gardine and her father immediately after the will was signed.

■■ While evidence of physical and mental condition both before and after the execution of the will is admissible on the issue of testamentary capacity such evidence lacks probative value to carry contestants' case to the jury, unless it raises a reasonable inference that testator did not, at the time of executing the will, have mind enough to understand the ordinary affairs of life, the nature and extent of his property, who comprised the objects of his bounty and how he was disposing of his property by the instrument he was executing. Adams v. Simpson, 358 Mo. 168, 213 S. W. (2d) 908, 911; Whitacre v. Kelly, 345 Mo. 489, 134 S. W. (2d) 121, 124. Physical ills are not necessarily mental ills. Thomasson v. Hunt (Mo. Sup.), 185 S. W. 165, 169. In view of the other facts shown by this record, the provisions of the will, the powers granted to the executor and the testamentary trustee and the changing beneficiary of his life insurance, as shown, would not sustain an inference of testamentary incapacity. Substantially all of testator's property was left for the benefit of his children. His wife was then separated from him and she subsequently obtained a divorce. The conditions testified to by Mrs. Gardine and her father and the surrounding facts and circumstances shown are not such as to justify an inference that the same facts existed at a certain time in the immediate past when the will was executed. Whitacre v. Kelly, supra; Snowwhite v. Metropolitan Life Ins. Co., 344 Mo. 705, 127 S. W. (2d) 718, 721. A careful review of the whole record fails to disclose any substantial evidence to overcome the prima facie case of testamentary capacity made out by proponents.

■ On the issues of fraud and undue influence in the procuring of the will, appellants rely on the detailed provisions of the will granting wide discretionary powers to the executor and testamentary trustee, to the authorization for payment of insurance to the executor ·

in a lump sum, to the confidential relationship of attorney and client between Gardine and Cottey, to Cottey's activity in drafting the will and handling the insurance papers, to the relationship between Cottey and Higbee and to the evidence of alleged fraud on Mrs. Gardine and the Gardine estate. Appellants construe the will as conferring special benefits upon Cottey and as making him a beneficiary of the will. They rely upon circumstances to show activity in procuring its execution. See, Clark v. Powell, 351 Mo. 1121, 175 S. W. (2d) 842, 846. Appellants insist that the existing confidential relationship, activity and benefits conferred shifted the burden of proof to proponents to show that there was no fraud, overreaching or undue influence practiced on testator.

The appointment of Cottey as executor and his father-in-law as testamentary trustee did not shift any burden of proof to proponents, because the will by such appointments did not confer any benefits or advantage which would not be reaped by a stranger if so designated by testator. Ryan v. Rutledge (Mo. Sup.), 187 S. W. 877, 879; Huffnagle v. Pauley (Mo. Sup.), 219 S. W. 373, 377; Shelton v. McHaney, 338 Mo. 749, 92 S. W. (2d) 173, 180. The record contains no substantial evidence of fraud or undue influence practiced upon testator.

The court did not err in directing a verdict in favor of the will. The judgment on this count is affirmed.

### III.

The third count of the petition is based upon the judgment for support and maintenance of the Gardine children as contained in the decree of divorce entered on September 22, 1947. By said decree Mrs. Gardine was awarded the custody of her three minor children and a judgment for $100 for their support and maintenance. Plaintiffs alleged that the monthly payments were regularly made prior to Gardine's death on June 11, 1948; that, after Mrs. Gardine had been appointed guardian of her three minor children and after L. F. Cottey was appointed executor of Gardine's estate and while said estate was being administered upon in the probate court of said county, Mrs. Gardine, as guardian, filed a claim against Gardine's estate based on said judgment of September 22, 1947; and that, on August 9, 1948 the probate court of said county, at the instance and request of the executor, refused to allow or classify a claim against said estate based upon the judgment.

In this proceeding appellants seek to have her claim under said judgment established against said estate for the sum of $100 per month, continuing until the youngest child of the deceased shall become 21 years of age, and appellants prayed that her claim be allowed in the sum of $19,200. In the brief, appellants state that Mrs. Gardine "filed in the probate court a certified copy of the circuit

court judgment and asked that the same be classified and allowed against said estate, which said probate court refused to do."

Defendants moved to strike out and dismiss this count of the petition on the ground (1) that the matter attempted to be presented was within the jurisdiction of the Probate Court of Schuyler County, which court had assumed and acquired exclusive jurisdiction of the claim; (2) that the matter had been fully and finally determined by judgment of said court and the judgment was res adjudicata and a bar to any proceeding thereon in the circuit court; and (3) that the circuit court was without jurisdiction to consider, hear or determine the claim. The motion was sustained and the count dismissed, apparently upon the theory that the count failed to state a claim upon which relief could be granted.

Appellants assign error on the court's action and contend that, in absence of statutory inhibitions, it is the general rule that provisions for support of minor children contained in divorce decrees do not necessarily terminate upon death of father; that the obligation of a father to make payments for support of his children, whose custody has been given to his divorced wife, is not discharged by his death either as to past due payments or as to payments to become due in the future; and that, "not only does this obligation survive against the estate of the deceased father for past due and future payments, but the court under its authority to alter the decree as circumstances might require could do so and aggregate the amount to be due by the time child reaches its majority and could declare same to be a lien on husband's estate."

While the claim in the probate court was based upon a decree of divorce in so far as it provided for the support of the children, the record does not show the form of the claim nor the amount for which it was filed, nor do the pleadings disclose the form of the judgment, if any, that was entered denying the claim. Defendants' answer denied that the Probate Court of Schuyler County refused to allow and classify the claim and alleged that jurisdiction to hear and determine the claim was vested in the probate court. The parties have briefed the matter on its merits. The particular issue presented for decision is whether the amount of the installments subsequently accruing after Gardine's death constitute a valid claim against his estate. Apparently the question has not been decided in this state. We hold that they do not.

It is apparent that the purpose of the action is to remove $19,200 from the estate of the deceased and prevent such sum from reaching the trust estate as set up for the children under the will, to keep the expenditure of the fund subject to the control of the children's mother (who was divorced from their father) and to prevent the amount from being paid over to the testamentary trustee, where its use for the benefit of the children will be subject to the broad dis-

cretion of the trustee. This is not a case where a father has undertaken to disinherit his minor children.

By authority of Sec. 1519 R. S. 1939, the decree provided for the support of the children, but no security for the payment of the judgment was required. The amount to be paid monthly, as provided by the judgment for the support of the children, was subject to modification at any time to meet changed conditions. Sec. 1519, supra. This action is based solely on the judgment and not upon any contractual obligation assumed by the deceased to pay the specified amount to Mrs. Gardine each month during the minority of the children. The decree provided "that she (plaintiff therein) have and recover of the defendant, for the support and maintenance of said children, the sum of $100.00 per month, which sum the defendant is hereby ordered to pay to the plaintiff on the 23rd day of each succeeding month hereafter, commencing on the 23rd day of October, 1947 * * *.

It has been held, "that a lien does not follow the entry of a judgment for the maintenance of minor children, payable in future periodical installments, and subject to be increased, diminished, or defeated altogether as changed conditions of the parties may from time to time require." Hagemann v. Pinska, 225 Mo. App. 521, 530, 37 S. W. (2d) 463, 467. The total amount of the installments which would accrue from the time of deceased's death to the time the youngest child should arrive at the age of 21 years did not constitute a lien or a charge against deceased's real estate or personal property at the time of his death.

Under the statute of descents and distribution, Sec. 306 R. S. 1939, the share of a minor child in his father's property is not different from that of an adult. Statutory provision is made for the support and maintenance of minor children during the year following their father's death. Secs. 106 and 110 R. S. 1939. Sec. 247 R. S. 1939 provides for appropriations for the support of minor children, under certain circumstances, when they are "not otherwise provided for," but we find no authority in this state to support the allowance of this claim for the total amount of all installments which would accrue subsequent to Gardine's death and prior to his youngest child becoming of age.

Ordinarily the only claims which may be allowed against a decedent's estate are debts of the deceased in existence at the time of his death and statutory allowances, costs and statutory liabilities incurred by his estate after his death. Presbyterian Church v. McElhinney, 61 Mo. 540; Ver Standig v. St. Louis Union Trust Co., 344 Mo. 880, 129 S. W. (2d) 905, 909; Ferguson v. Carson, 13 Mo. App. 29, 33.

In effect appellants contend that the judgment for support and maintenance did not terminate with Gardine's death; and that future installments, which are to accrue subsequent to his death, con-

stitute a debt and a proper demand for allowance against Gardine's estate. In the absence of statutory inhibitions, the weight of authority seems to be to the effect that a father's obligation under a divorce decree to pay a stated amount per month for the support of his minor children does not necessarily terminate upon his death, but may survive against his estate as to such subsequently accruing installments thereunder, after his death and during the minority of the children; and that such is particularly true where the divorce decree is made a lien upon the father's property, where the divorce decree ratifies and confirms a written obligation of the father to so support the children during such period of minority, where the father has been required to give security for the support of his children during such entire period, or where the judgment on its face manifests an intention to make defendant's liability for maintenance a continuing one after his death and a charge against his estate. 17 Am. Jur. 536, Divorce and Separation, Sec. 706; 27 C. J. S. 1252, Divorce, Sec. 323 (c); Newman v. Burwell, 216 California 608, 15 Pac. (2d) 511, 572; Gains-burg v. Garbarsky, 157 Wash. 537, 289 Pac. 1000; Miller v. Miller, 64 Me. 484; Creyts v. Creyts, 143 Mich. 375, 106 N. W. 1111; Murphy v. Moyle, 17 Utah 113, 53 Pac. 1010; Mansfield v. Hill, 56 Ore. 400, 107 Pac. 471; Stone v. Bayley, 75 Wash. 184, 134 Pac. 820; Silberman v. Brown (Ohio), 72 N. E. (2d) 267; Garber v. Robitshek, 226 Minn. 398, 33 N. W. (2d) 30, 33; Annotation 50 A. L. R. 241. Although there is much conflict of authority, the rule seems to be otherwise where such conditions do not expressly obtain. Blades v. Szatai, 151 Md. 644, 135 Atl. 841; Rice v. Andrews, 217 N. Y. Supp. 528, 127 Misc. 826; Guinta v. Lo Re (Fla.), 31 So. (2d) 704; In re Arsdale's Will, 75 N. Y. S. (2d) 487, 190 Misc. 968; Schultze v. Schultze (Texas Civil App.), 66 S. W. 56, 58; Esteb v. Esteb, 138 Wash. 174, 246 Pac. 27; Robinson v. Robinson (W. Va.), 50 S. E. (2d) 455; Sandlin's Admr. v. Allen, 262 Ky. 355, 90 S. W. (2d) 350.

In the Schultze case, supra, no lien was imposed upon defendant's property to secure the payment of the installments and, when the defendant (father) died, he left his entire estate to his child for whose support the divorce decree had provided. The court said: "Upon Schultze's death the estate became the property of the child, and from that time on, if plaintiff was allowed to enforce these payments, they would come from its property. Plaintiff would, by virtue of a judgment against her husband, be appropriating the child's property for its support. This is incompatible with the statutes of this state relative to minors' estates, which provide the mode and manner by which their property may be taken for their maintenance and support. Our statutes not only throw restrictions around the use of a minor's estate for its support, and commit the jurisdiction of such matters in the county courts, but they also, in the administration of deceased persons' estates, provide for the granting of allowance to

children of the deceased. There being, under the circumstances of this case, no liability by virtue of said decree for these payments after Schultze's death, the basis falls upon which appellant endeavors to construct a receivership or trusteeship for this estate.''

In Sandlin's Administrator v. Allen, supra, it is said that ''without a divorce, the father is only bound to support his infant children so long as he lives, and it would be illogical to hold that, by reason of a divorce decree, a child is in a better position in respect to his father's estate than he would be without the decree of divorce.'' (90 S. W. (2d) 350, 353).

In Robinson v. Robinson, supra, 50 S. E. (2d) 455, 459, the court said: ''In the first place, under our system of law, and going back to the common law, the obligation of a father to support his child during its minority is firmly fixed; but no one will contend that such obligation creates a lien against his estate. On his death, the only right in his estate possessed by a child is the right of inheritance under statutes existing at that time. * * * A decree against a father for maintenance and support, adds nothing to his obligation to support his children during their minority; it only provides for the enforcement of such duty. * * * We know of no instance where a lien can be created against the estate of a person after his death. Death draws the line, and estates are settled and distributed according to the situation then existing. Conceivably, a lien such as is contended for herein could accrue over a period of fifteen or more years, during which time there would be no definite guide to determine the amount which might become due, the result of which would be to make difficult the transfer of property affected by such a lien. We think the safe and reasonable rule to apply, particularly as to the children, is to hold that a decree in a divorce suit, for the support of children, should have no effect beyond the life of the party liable therefor.''

Many cases outside of this jurisdiction hold that the common law obligation of a father to support his minor children ceases at the father's death. Blades v. Szatai, supra; Carey v. Carey, 163 Tenn. 756, 43 S. W. (2d) 498, 499; Robinson v. Robinson, supra. This court has not determined that issue, but has said that, ''When both parents are *living*, the primary liability for the support of a minor child is in this state, as it was at common law, upon the father.'' (Italics ours). Kelly v. Kelly, 329 Mo. 992, 47 S. W. (2d) 762, 767; Robinson v. Robinson, 268 Mo. 703, 186 S. W. 1032, 1033; Wrigley v. Wrigley, 345 Mo. 207, 132 S. W. (2d) 989, 992. ''It is the duty of the father in the first instance to care for and support his children, and if for any reason that duty of his is abrogated, then it becomes the duty of the mother to care for and support them.'' State ex rel. Shoemaker v. Hall (Mo. Sup.), 257 S. W. 1047, 1055.

The divorce statute (Sec. 1519, supra) provides a method for determining in advance the extent of the husband's common law obliga-

tion for the support of the child. See, Kelly v. Kelly, supra (47 S. W. (2d) 762, 767) ; Sec. 1519 R. S. 1939. While "absolute divorce, as recognized by our law, and the consequent power of courts granting same to make provision for the care, custody, and maintenance of minor children after marriages are dissolved, is of purely statutory creation" (Robinson v. Robinson, 268 Mo. 703, 186 S. W. 1032, 1033), yet such a judgment for support is in effect substituted for the common law liability of support which would otherwise exist and which would end with the father's death. The purpose of the statute apparently is to provide a mode of procedure for obtaining maintenance for the child and for determining in advance the extent of the common law obligation of the father and the means of enforcing it against him.

We think that orderly procedure in the administration of estates requires that such a claim for future support of minor children be denied. In this case, such an allowance would necessarily come out of the children's own trust estate. By his will, their father has provided for their support, maintenance and education. We think the better and more satisfactory rule is the one which holds that the liability of the father for the future support of his minor children terminates at his death, regardless of the fact that the obligation for such support is evidenced by a judgment.

We hold that under the facts of this case, the obligation of the deceased under the divorce decree to pay $100 per month to his divorced wife for the support of his minor children terminated upon his death, and that the terms of the judgment may not be enforced against his estate for any period subsequent to decedent's death. In re Van Arsdale's Will, supra; Guinta v. Lo Re, supra; Blades v. Szatai, supra; Schultze v. Schultze, supra; Sandlin's Admr. v. Allen, supra; Robinson v. Robinson, supra (50 S. E. (2d) 455) ; Barry v. Sparks, 306 Mass. 80, 27 N. E. (2d) 728. And see, Bishop v. Bishop (Mo. App.), 151 S. W. (2d) 553, 556.

The judgment on this count is affirmed. *Hyde, C. J.,* concurs; *Conkling, J.,* concurs in separate concurring opinion; *Leedy, Tipton, Clark* and *Ellison, JJ.,* concur in principal opinion as modified by separate concurring opinion of *Conkling, J.*

 CONKLING, J. (concurring).—I concur in all that is said in the principal opinion as to each count considered, except, that I cannot agree, as to Count II, that, "there is nothing in this record to justify this court in overthrowing any fact issue determined by the trial court upon the conflicting oral testimony of these witnesses".

Count II is in equity and we consider de novo all the testimony relating thereto. The principal opinion defers to the trial court's conclusion that, upon the instant facts, the written contract of settlement between LeRoy E. Gardine and Mary Ann Gardine "was not *procured* by any fraud". For reasons stated in the principal opinion

(among them, because the contract in question was "void and against public policy"; and because of the fraud perpetrated by Mr. Gardine's counsel "in acting as attorney in the institution and consummation of her divorce action and in the execution and delivery of the conveyance under the contract"; and because "the parties are not in pari delicto") the conveyance to the 400 acre turkey farm is therein set aside.

While I agree with all that is said in the principal opinion about those last above stated matters, from a reading of this transcript and from the statement of facts in the principal opinion it is my view that the facts made out a case upon which plaintiff was entitled to the relief sought upon the ground of fraud. As I read the facts in this transcript, I think that LeRoy E. Gardine, by his agent and attorney, by fraud, duress and concealment induced Mrs. Gardine to enter into the property settlement contract and induced her to execute to him the deed in question as to the 400 acre farm.

The facts as shown by this record, and, as stated in the principal opinion are quite revealing. I restate but a few of those facts. Mr. Cottey, counsel for Mr. Gardine, assisted the latter to change "the beneficiaries of some $38,000 of life insurance from Mrs. Gardine and the children to his estate". Mr. Cottey also prepared Mr. Gardine's will wherein Mrs. Gardine was excluded because she was "provided for out of entirety property". Mr. Cottey thereafter called Mrs. Gardine, who already had other counsel, to his office. Of the conversation which there occurred Mr. Cottey, in part, testified: "I told her if she proceeded to file suit for divorce we would contest it, we couldn't allow the divorce or the farm to be sold on account of his condition; that it was the only way he had of making a living. I don't recollect that she said anything to that. I told her a contested divorce suit was a hard one to win for the plaintiff—the hardest type to win for the plaintiff—that largely the basis for a divorce suit is founded on conversations between the husband and wife, and if no one else is present, if contested, such conversations are not admissible. I said it would be a public airing of the whole thing, and an occasion for making public their differences in a knock-down and drag-out. She said that was what she didn't want. I said 'If you are insisting it might be that a property settlement be arranged between you and Roy, but the demands you and your father are making of him he cannot meet' ".

Later, Mr. Cottey prepared the divorce petition for her as her counsel and represented her in court before Judge Walter A. Higbee. Mr. Cottey had prepared the decree which Judge Higbee entered in the divorce case. Among other things that decree recited that: "The court doth further find that plaintiff and defendant have fairly agreed upon a property settlement between themselves, contingent upon the granting of a decree of divorce to plaintiff herein, wherein adequate provision has been made for plaintiff in lieu of, and in satisfaction and

settlement of, any claim which plaintiff might otherwise have against defendant for alimony; that such property settlement should be approved and confirmed.''

Judge Higbee testified: ''Q. You didn't see the property settlement? A. No. Q. After the case was before you, you didn't see the property settlement? A. No. Q. So at no time in court the counsel for this young lady showed you the property settlement? A. No.''

Whether or not Judge Higbee knew what was in the contract of property settlement Mr. Cottey knew what was in it, for he wrote it. Mr. Cottey also knew about the life insurance and the will. Mr. Cottey further knew that before the contract was executed, he had not advised Mrs. Gardine ''as to her rights in the real estate owned by husband and wife as tenants by the entirety''. The recital in the divorce decree (prepared by Mr. Cottey) that Mr. and Mrs. Gardine had *fairly* agreed upon a property settlement was of itself a fraud upon Mrs. Gardine, and upon the court.

I agree with the principal opinion that Mr. Cottey, improperly represented both parties in adverse litigation without revealing to Mrs. Gardine the serious nature and effect of the transactions upon her financially, in order that she could, if she desired, secure her original counsel (or other counsel) to represent her. That no lawyer may do. In re Buder, 358 Mo. 796, 217 S. W. (2d) 563. Such concealment bears on the issue of fraud and goes to the heart of the legality of the contract. At no place in this record do I find any explanation of that portion of the duress and coercion used by Mr. Cottey to Mrs. Gardine, wherein the former said that: ''I told her (Mrs. Gardine) * * * we couldn't allow the divorce or the farm to be sold on account of his condition''. Neither Mr. Cottey nor Mr. Gardine could allow or disallow her a divorce if her pleadings and her evidence should entitle her to it. Such a matter is for the trial court to determine and to allow or disallow. The admitted facts show not only that Mrs. Gardine ''was imposed upon and overreached''. It is my view that the admitted facts further show she was fraudulently coerced into the execution of the contract. Fraud inhered in the contract itself.

While I agree with the principal opinion, except as noted in the opening paragraph hereof, it is my conclusion from the record facts that the property settlement contract was *procured* by fraud. For this additional reason, as well as those stated in the principal opinion, I think the relief prayed in the second count should be granted.